**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------×
NELSON CHANG, KWAKU NTOSO, JIA PENG, and
LISA WRIGHT,

                    *Plaintiffs,*

      *v.*

MIZUHO SECURITIES USA LLC and MIZUHO BANK
(USA),

                  *Defendants.*

------------------------------------------------------------------------×

**21 CV 874**

**COMPLAINT**

***Plaintiffs Request a Trial by Jury***

Plaintiffs Nelson Chang, Kwaku Ntoso, Jia Peng, and Lisa Wright (collectively, "Plaintiffs") through their counsel, The Liddle Law Firm PLLC, allege for their Complaint against Defendants Mizuho Securities USA LLC ("MSUSA") and Mizuho Bank (USA) ("BKUSA") (collectively, "Defendants") as follows:

**PRELIMINARY STATEMENT**

1.      Under 42 U.S.C. § 1981, all persons within the United States have the same right to make and enforce contracts as is enjoyed by white citizens.  The term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Indeed, as originally enacted and conceived, and still today, race discrimination in the termination of employment is a violation of the statute and even the termination of an "at-will" employment contract is a violation if the termination is motivated by racial discrimination.

2.      Under 42 U.S.C. § 1981, Plaintiffs Chang, Peng, Ntoso and Wright seek an award of compensatory and punitive damages, attorneys' fees and costs from each defendant, MSUSA and BKUSA, jointly and severally as joint employers, under 42 U.S.C. § 1981 for race discrimination and retaliation.

1

3.     Defendants' discriminatory treatment of Plaintiffs was willful, malicious, and in reckless disregard of Plaintiffs' protected rights.

**JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES**

4.     Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, this Court has original jurisdiction over Plaintiffs' claims arising under 42 U.S.C. § 1981.

5.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, which is the judicial district in which Defendants reside.

**PARTIES**

6.     Plaintiff Chang at all times relevant hereto, was and is a resident of Essex County in the State of New Jersey.

7.     Plaintiff Ntoso, at all times relevant hereto, was and is a resident of New York County in the State of New York.

8.     Plaintiff Peng, at all times relevant hereto, was and is a resident of Cook County in the State of Illinois.

9.     Plaintiff Wright, at all times relevant hereto, was and is a resident of Cook County in the State of Illinois.

10.     Each of the Plaintiffs worked in Defendants' Power and Utilities Group ("PUG").

11.     Mizuho Financial Group ("Mizuho"), a nonparty, is a Japanese corporate, commercial and investment banking institution that provides virtually all known financial services globally.  It was created by the combination of Dai-Ichi Kangyo Bank ("DKB"), the Industrial Bank of Japan ("IBJ"), and Fuji Bank ("Fuji") in 2000.

12.     Upon information and belief, at all times relevant hereto, Defendant MSUSA was and is a member of the Financial Industry Regulatory Authority ("FINRA") and regulated by the

United States Securities and Exchange Commission ("SEC"), as well as other regulators. MSUSA's headquarters is located at 1271 Avenue of the Americas, New York, NY 10020. MSUSA is an indirect subsidiary of Mizuho. MSUSA operates as an investment bank and securities firm and offers, among other services, corporate finance, debt and equity capital markets, merger and acquisition advisory services, and trading, sales end research of equities, fixed income, and foreign exchange.

13.     Upon information and belief, at all times relevant hereto, Defendant BKUSA was and is a corporate banking institution with its headquarters located at 1251 Avenue of the Americas, New York, NY 10020.  BKUSA is an indirect subsidiary of Mizuho and is regulated, upon information and belief, by various U.S. regulators, including the Federal Reserve.  BKUSA provides corporate banking products, including lending, finance and other banking services.

## STATEMENT OF FACTS

*Common allegations*

14.     Plaintiffs Chang, Peng, Ntoso, and Wright were employed pursuant to at-will employment contracts with MSUSA and BKUSA.

15.     By the commencement of the JFY 2018 (i.e., "Japanese Fiscal Year," commencing April 1, 2018), each Plaintiff was employed by MSUSA within PUG in the investment bank but were also "dual hat" employees of MSUSA and BKUSA.  In December 2019, each Plaintiff was informed that their "primary employer" would be MSUSA.

16.     Each Plaintiff is a member of a racial minority and a person of color: Peng and Chang are Asians and Wright and Ntoso are Black/African Americans.

17.     Each Plaintiff was promised that they would be paid and promoted in accordance with their performance and compensated competitively in the marketplace, and without regard to their race.

18.     Each Plaintiff was paid a base salary and annual bonus.  Bonuses were allegedly subject to a renumeration policy, which constituted an implied contract.  Each Plaintiff was discriminated against under the renumeration policy, which was regularly breached and implemented differently for persons of color, such as plaintiffs, than it was for white employees.

19.     Each Plaintiff was paid less than comparable white employees within MSUSA.

20.     These differences were hidden from Plaintiffs even though the renumeration policy is based on "… transparency in renumeration practices [which] is important for enhancing job satisfaction and motivation to contribute to the organization.  [Transparency in renumeration] also ensures that Mizuho's renumeration and incentives are competitive within each market."  Specifically, each was underpaid with regard at least to their JFYs 2018, 2019 and 2020 bonuses.

21.     Each Plaintiff was promised an avenue to promotion leading to Managing Director and, after April 1, 2018, each was denied the opportunity to be promoted.  Mizuho states in its published "HR Policy" (Rev. March 30, 2018) that Mizuho is "… committed to providing ideal standards for the qualities, skills, and capabilities required for promotion…."  For promotions, Plaintiffs were told that the selection process would also be "… fair and transparent…."

22.     Each Plaintiff contributed significantly to the record revenue of PUG for JFY 2020 ending March 31, 2021, but for the reasons set forth hereinafter, each has been deprived of bonus compensation they expected to be paid.

23.     Chang, Peng, and Wright were each terminated after the assertion of their rights to be free from discrimination and according to the terms and conditions of their contract of employment, each Plaintiff was unwilling to sign a general release of all their claims including the claims asserted herein.

24.     Ntoso was constructively terminated when MSUSA and Kris Grosshans, the white Managing Director who was Head of PUG, breached MSUSA's agreement with Ntoso regarding client coverage and credit for the revenues associated with the specific clients promised by Grosshans to Ntoso.  Because MSUSA's breaches of its promises, Ntoso realized he had no future at MSUSA and left MSUSA in January 2021.

25.     Each Plaintiff fulfilled all obligations to MSUSA (and BKUSA) under their employment contracts and each was favorably reviewed both internally and externally regarding the work they performed.  Each received favorable client feedback.  Each Plaintiff performed their job with diligence and skill.  The reviews, however, were often times permeated with subjective criticism that were, in fact, thinly disguised racial stereotyping.  Thus, for example, blacks were lacking initiative, i.e., "lazy," and Asians were 'good with numbers," i.e., not personable in client relations.  Sometimes, the criticism was utterly ridiculous, as in suggesting that Wright, a black female, was not "bonding" with her young white male peers by not "socializing" with them.  Chang, Ntoso, and Peng were denied promotions to Managing Director.  Wright was denied promotion to Director.

26.     Over their careers, each plaintiff was verbally demeaned, undermined, and stereotyped based on race and treated less well than white employees.

***Nelson Chang***

27.     Chang began working at DKB, a predecessor of Mizuho, in 1997 as an Analyst in the "middle office."  He was promoted to Vice President in 1999 and remained with DKB and thereafter with BKUSA upon the combination of DKB, Fuji, and IBJ.

28.     In 2012, Chang was promoted to Senior Vice President and functionally became a Team Leader in the middle office.  Chang's team was dedicated to supporting PUG.  In the middle

office there was only one managing director and little or no opportunity to be promoted to managing director.

29.     In 2015 or 2016, Chang received a title promotion to Director.

30.     In 2017, Chang was promoted from the middle office to the position of investment banking calling officer in the "front office."  He also received a title promotion to Executive Director, the job level just below Managing Director.

31.     Like Peng and Wright, in December 2018, Chang's "primary" employer became MSUSA, although at all times he also remained an employee of BKUSA under the "dual hat" concept.  In all other respects, his employment contract remained the same.

32.     As an Executive Director, Chang was told to expect to make higher compensation in the form of both increased base salary and in bonus compensation.  The promotion was intended to provide Chang the opportunity to be promoted from executive director to managing director. Managing directors enjoy the greatest responsibility and prestige and they in turn are, as a group, paid significantly more than executive directors.  Similarly, executive directors generally make more than directors, directors more than senior vice presidents, and so on.

33.     For JFYs 2018 and 2019, however, MSUSA severely reduced Chang's bonus compensation and total compensation from his last two full years in the "middle office."

34.     Although Chang continued his excellent performance in both client facing functions and support of the managing directors in PUG after the move to the PUG, a new manager, Kris Grosshans, stifled promotion and compensation of Chang and the other plaintiffs. After Grosshans, a white managing director, became PUG Head officially on April 1, 2018 (but who had been functionally running the group for a month or so prior) neither Chang nor any of the Plaintiffs were ever promoted or paid comparably to white employees in MSUSA.

35.     During his tenure, Chang endured a litany of derogatory and biased remarks about Asians from Grosshans and other white managing directors.

36.     Managing Directors made racially demeaning comments about Asians in Chang's presence, generally acting as if they were sharing an "inside" joke with Chang.  Fearing for his job, Chang endured these insults and bigotry.

37.     By way of example only, in 2012, Raymond Ventura, a white Senior Vice President and Chang's boss, called Chang, who was born in Ohio and raised in Pennsylvania, a "Chinaman."

38.     In 2015, Ventura referred to Chang as "[my] bitch."

39.     In November 2019, during a business dinner at *Vincenzo Cucina Italiana* restaurant in Orlando, Florida, Michael Donohue, a white Managing Director in PUG and Chang's direct supervisor on many client accounts, entertained the diners with his impression of an Asian accent by mocking the accent in an exaggerated way and ridiculing Asians and people of color in the process.  Chang was embarrassed and humiliated, but Donohue was one of his bosses and Chang needed his job.  Lest there be any doubt, Ntoso and Wright were fortunately also at the dinner and witnessed the humiliation of Chang.

40.     From 2015 when Chang began to work with Donohue, Donohue even referred to Japanese people in a demeaning and derogatory way.  For example, Donohue regularly conveyed his thoughts that if any of the Japanese management of Mizuho (a Japanese company headquartered in Tokyo) gave Defendants any problems Japan should "just be bombed again," referring to the World War II bombings of Hiroshima and Nagasaki.  Again, Ntoso also heard these comments from Donohue.

41.     These and other comments were not just hurtful but were aimed at Asians and Chang, and made in Chang's presence and sometimes in front colleagues.  The impact was to demean and degrade Chang because of his race.

42.     Without notice, in late January 2021, almost 5/6ths of the way through the bonus year, i.e., JFY 2020, MSUSA without any prior discussion or warning proposed that Chang transfer back to the middle office and, in the process, accept a two-level demotion.  Grosshans knew that such a move – from client Calling Officer in the front office to a team member on the very team that Chang had previously led as Team Leader and which position had reported to Chang years earlier– would be an unacceptable move, depriving Chang of bonus compensation and effectively ending Chang's potential promotion to Managing Director.

43.     Chang was shocked.  PUG was well on its way to record annual revenues for JFY 2020, in part, due to Chang's efforts.  During JFY 2019 and renewed again in JFY 2020, Chang had completed a significant supply chain finance transaction, the first of its kind in PUG. Grosshans moreover could not commit to paying Chang a bonus at *all*.  Chang was not given any indication of which department, if any, but that the bonus would be "substantially based on time as a coverage officer."  Chang did not receive a bonus.  Moreover, three of Chang's colleagues, the other Plaintiffs here, each received no bonus at all, just like Chang.  Upon information and belief, the bonus compensation the Plaintiffs would have been receiving this May was being paid instead to several newly hired white professionals – including a laterally hired white managing director – who had worked only a fraction of the year never met any of the clients in person and contributed almost nothing to the record revenue.

44.     A day or two later, Chang posed to Grosshans several questions about how this "transfer," or demotion, would impact his compensation and his promotability.  The answers were

even worse than could be predicted.  There was no bonus to be paid to Chang (despite the supply chain deal and the Power and Utilities Group's all-time record revenue year) and, once Chang returned to the middle office, instead of being next in line for promotion to managing director as he was theoretically in PUG, he would be fifth in line for promotion to Managing Director in the middle office.  Worse yet, there was only one Managing Director in the middle office, Ventura, and there would not be an "opening" until Ventura left, ostensibly years from now.   On this telephone conference, MSUSA did not tell Chang that failure to accept the "transfer" would result in termination.

45.     Chang declined the transfer and said he would continue his job responsibilities. Mizuho retaliated against Chang by summarily terminating his employment without cause and without severance under the severance plan, for which Chang was clearly eligible after 24 years of service.  Nevertheless, Grosshans and others continued inviting Chang to meetings and copied him on internal communications related to clients and client projects.  Meanwhile, Chang immediately complained about his termination through his counsel to MSUSA's counsel.

46.     Chang was treated as ineligible for severance under the severance plan.  He received no severance, no JFY 2020 bonus, no payout of his statutorily required accrued vacation pay and no contemporary health care coverage for he and his wife and two children.  The reason he was fired was that he had "quit" and severance was only available to those who were terminated involuntarily and not for cause.

47.     After MSUSA's counsel took this preposterous position, and after MSUSA was confronted again, Chang was then offered one year of base salary, not as severance, but as a "settlement," given a couple of days to agree to the proposal that required if he sign a full general release of all claims, including the race discrimination claims he has raised herein.  Of course, all

of this was very irregular.  Chang, 49-years old, received no review time (21 or 45 days) or 7-day unilateral revocation period under the Older Workers Benefit Protection Act ("OWBPA"), and was not advised to seek an attorney.  He was offered no bonus, *pro rata* or otherwise, and no separate consideration to support the release.  None of the OWBPA requirements were met.  He refused to sign the general release and has been unemployed since.

***Kwaku Ntoso***

48.     Ntoso was hired by MSUSA after working two years in UBS's investment banking department in the Power Companies' Sector and began his employment there on August 8, 2011. At all times, Ntoso was part of PUG.

49.     Ntoso's career path was as an investment banker in PUG.  This means he would develop banking skills, including advising, strategy, and execution of transactions over time.  His function was as a "Calling" or "Coverage" Officer with his own account assignments for accounts over which he had primary responsibility and would receive revenue credit potentially leading to significant compensation.

50.     Ntoso's reviews and client feedback were positive, but like Chang and Peng, he was never promoted to managing director.

51.     In 2013, Ntoso was promoted from Associate to Vice President.

52.     In April 2017, he was again promoted, this time, to Executive Director.

53.     Executive Director is the highest job title at MSUSA short of Managing Director.

54.     The ultimate career goal is to become a Managing Director, which is a title well-known within banking.  Even more importantly, it is a title clients respect.  Clients expect to be "covered" by a Managing Director as the title conveys to the client that their banker has achieved the highest level of professional competency.

55.     Executive Director, on the other hand, is an obscure and seldom used title that clearly flags to clients and others that one has not achieved the highest level of professional attainment in MSUSA's opinion.

56.     Ntoso was underpaid as against similarly situated white executive directors in investment banking at MSUSA, denied promotion opportunity, and lied to by white managers of PUG until he confronted them, at which point he realized that despite his hard work and diligent efforts, there was no future for him at MSUSA because of his race and color.

57.     In part, the breach of the promises made to him by Kris Grosshans about specific client coverage assignments and credit for his work, were totally breached.  Promises were made: that (1) Ntoso, an Executive Director, would be eligible for promotion to managing director based on leading deals with his own accounts and establishing his own revenue generation record, (2) Grosshans would reassign six accounts from white managing directors to Ntoso so he could lead his own deals for his own accounts and generate revenue, and (3) he would be evaluated on the success he achieved enabling him to become a managing director and increasing his compensation based on his efforts.  No Black or African-American person had ever been a managing director in PUG and no Black or African-American or Asian person had ever been promoted to managing director in PUG.  In PUG, there were only three Executive Directors: Chang, Peng, and Ntoso. Thus, in PUG, one hundred percent of this job category was filled with people of color/racial minorities.  Throughout MSUSA's investment banking coverage sectors, however, there are/were white executive directors.

58.     Internally in PUG, Ntoso was falsely told that only Managing Directors could have revenue "associated" with their names, when in fact the white executive directors outside of PUG,

but in the other sectors such as "financial sponsors," frequently had formal primary coverage of accounts and credit for revenue from these clients.

59.     Until approximately April 1, 2018, PUG had been led by Brady Sadek, who actively hired and promoted minorities, women, and people of color.  Sadek, however, was by April 1, 2018, transitioning into retirement.

60.     Grosshans became Head of PUG, which relegated Sadek to a more "ceremonial" senior "statesman" type role for the transition.  From the moment Grosshans became Head of PUG, no African American or Black person has been hired by MSUSA into PUG, nor has any racial minority been promoted, or stunningly, been paid close to their white peers in MSUSA.  New hires, including a lateral managing director from Royal Bank of Scotland Securities ("RBS"), were white.

61.     In April 2018, Ntoso requested that Grosshans name him as the "primary banker" for several accounts that were currently under the names of PUG managing directors.  These were accounts of little or no interest to those managing directors, but would give Ntoso an opportunity to prove himself.  Ntoso was functioning as their primary banker anyway, even if he received no credit for generating revenues on those accounts.

62.     Grosshans meet with Ntoso at Ntoso's request and, at that meeting, promised in writing that Ntoso would be the named primary banker for six specific accounts and that the revenue from these accounts would be credited to Ntoso.  As such, his promotion to Managing Director could occur soon, depending on his performance.  The accounts were: Alliant Energy Corporation ("Alliant"), CMS Energy Corporation ("CMS"), DTE Energy ("DTE"), ITC Limited ("ITC"), Pinnacle West Capital Corporation ("Pinnacle"), WEC Energy Group Inc. ("WEC").  Of

course, Ntoso would continue in his secondary role on the many other accounts on which he worked.

63.     None of Grosshans's promises were kept.  None of the accounts were put under Ntoso's name. Instead, for the next 2 ½ years, the accounts continued to be listed under the names of the white Managing Directors under whom they were listed when Grosshans promised them to Ntoso, and the revenue generated by Ntoso's *de facto* handling of the accounts as primary banker was all officially credited to managing directors above Ntoso.

64.     While not keeping his promises to Ntoso, Grosshans kept Michael Donohue, Managing Director, (who is white) as the primary contact for CMS, DTE, and WEC.  Grosshans kept himself as the primary contact on Alliant.  Grosshans kept Peter Bickford, Managing Director, (who is white) as the primary contact on Pinnacle until his retirement.  Pinnacle was then reassigned to another managing director and not Ntoso.

65.     Grosshans, Donohue, and Bickford were already assigned to many other accounts. The six in question, at a minimum, were handled almost single handedly by Ntoso, even though he received no revenue credited to his name.  The Managing Directors, none of whom were Black, were paid handsomely and much more than Ntoso.  In sum, they were paid for Ntoso's efforts, and Ntoso was not.

66.     After the initial discussion, Ntoso worked for the remainder of JFY 2018 with the expectation from Grosshans that the account assignment transition would take place no later than the beginning of the JFY 2019, or by April 1, 2019.  It did not.  Indeed, when the Covid-19 Pandemic occurred ten months later and shortly before the end of the JFY 2019, no assignments had been effectuated.

67.     Ntoso, during the Pandemic, continued to generate revenue on the six and many other accountants whether as primary or secondary banker.  Although PUG had a record year which was obvious as early as September 2020, Ntoso received no credit.

68.     Thus, in November 2020, when Ntoso was informally offered an interview for a position with a competitor, he asked again to meet with Grosshans to see if Grosshans would live up to his promises.

69.     Grosshans along with Peter Calistri, Chief Operating Officer, met with Ntoso in what apparently was an attempt to dissuade Ntoso from moving forward with considering other employment.

70.     Ntoso explained to Grosshans and Calistri that he was concerned that there was no future for him at MSUSA.  He felt his progress had been curtailed, ironically not by the Pandemic but by Grosshans's failure to live up to his promises.  Indeed, one of the side effects of the Pandemic was that all companies needed additional capital and consequently PUG had its best ever year, generating over $180,000,000 in revenue.  Ntoso, like all of PUG, had worked remotely from mid-March 2020 on.

71.     In the meeting, Calistri asked Ntoso what "…would [Ntoso] want in order to stay with MSUSA?" and "to reject" the potential offer.

72.     Ntoso again explained that he wanted to be officially named the primary banker on the accounts that Grosshans had promised him, receive revenue credit for the deals on which he was the primary banker, and have a path to Managing Director.

73.     Calistri said it "… did not matter" whose name was on the account since "everyone actually [knows] [Ntoso was] doing the work" and, therefore, according to Calistri, for all intents and purposes, Ntoso was the primary banker.  Calistri implied that, since Ntoso's contributions

were known in the Power and Utilities Group, non-monetary recognition should be enough.  He did not address the promotion issue.

74.     Ntoso asked, if official assignment and revenue credit did not matter, why were Grosshans, Calistri, and MSUSA refusing to put his name on the accounts?  Calistri had no answer, and did not respond.

75.     Ntoso knew at that moment that he had no future at MSUSA.  He was constructively discharged.  Further, he was caught in a *Catch-22*: he could not become a Managing Director without revenue being associated with his name and he could not have revenue associated with his name without being a Managing Director.   This Catch-22 constitutes a pretext for the discrimination.

76.     The reason Grosshans refused to live up to his promises and name Ntoso the primary banker on the accounts was due to his race and/or color.  Grosshans feared that an African American as the primary banker for the accounts would not be acceptable to the clients.  The clients, however, clearly did not oppose Ntoso's efforts on their behalf; instead, clients were very happy with Ntoso.  Grosshans' unfounded fear that clients would be racist in their views was simply a reflection of Grosshans own (unlawful) biased views.

77.     Ntoso resigned with no hope for a future at MSUSA.  He received a written offer, several weeks later at another investment bank.

78.     Although his last actual day at MSUSA was January 15, 2021, Ntoso's industry records controlled by MSUSA say his registration with MSUSA ended in February 2021.

79.     Ntoso left MSUSA due to the systemic race- and color-based discrimination taking place, which resulted in underpayment for his work and the total frustration of promotion to Managing Director.

80.     Upon information and belief, of all of MSUSA and BKUSA there are only 3 African-American Managing Directors out of 200 Managing Directors.

*Jia Peng*

81.     Defendants discriminated against Peng based on her race (Chinese/Asian) in compensation, promotion and ultimately a retaliatory termination after she raised, through counsel, her rights to be free from discrimination based on race, national origin (she was born in China), and gender.

82.     Peng began her employment with BKUSA (vice president) in December 2013 and MSUSA in March 2014 (director).  She had previously worked at UBS Securities LLC for 7 years where she was a Director in the investment banking department.  Functionally, Peng performed sophisticated, high level modelling for deal origination and structuring, she trained and supervised juniors, and interacted extensively with the CFO and senior members of the finance department at client companies as well as supporting PUG's client relationship managing directors with their transactions.  Peng led the capital structure advisory function in PUG where she was able to position MSUSA PUG as a sophisticated, trusted advisor and thought leader through her comprehensive strategic advice.  Additionally, the relationship bankers relied on her to lead the team in modeling and structuring complex, bespoke financial solutions that led to direct and indirect revenues.  Clients universally praised her work and contribution.  More importantly, they liked her and sought out her help and opinion.  As it turns out, PUG leadership, Grosshans, ignored this latter aspect of Peng's performance and criticized her for lacking interpersonal skills.

83.     Peng was at all times a "dual hat" employee but, in December 2018, her "primary" employer became MSUSA.  Also, she was an Executive Director in MSUSA but called a director

in the BKUSA.  MSUSA, however, ignored their responsibilities to update Peng's industry records and never informed FINRA of her title promotion to executive director.

84.     Peng's white colleagues who were MSUSA Executive Directors, made significantly more in compensation than Peng.

85.     Peng's supervisor, Grosshans, made no secret of his biased feelings toward Chinese people by making discriminatory comments grounded in race-based stereotypes, including comments in her midyear and annual reviews.  These stereotypes were not intended as complimentary but as a way to put Asians in their place.  The comments reflected that Peng was studious, academic, especially good with numbers, but not a client person.

86.     These biases were shared by Grosshans with other white, male managing directors and employees and severely impacted Peng's fair opportunity in taking leadership roles in projects.

87.     For instance, Peng's white colleagues frequently and openly interrupted her with derogatory comments during internal meetings and talked down to her.  This was not just disrespectful conduct toward Peng, but on the occasions Grosshans was present when they occurred, no corrective action took place.  The white managers rarely, if ever, treated other white colleagues in this fashion.  When Peng complained, she was *told* she was wrong and she was being treated fairly.  When Peng's counsel raised the concern with MSUSA's general counsel when MSUSA was trying to get Peng to give MSUSA a general release, MSUSA refused to discuss, or even consider the issue.

88.     Additionally, Grosshans and his key management team, which consisted entirely of white males, habitually made decisions discriminatorily on compensation and promotion based on Peng's race and the anti-Asian stereotypes they applied to her.

17

89.     In August, at the height of the summer surge of the Covid-19 Pandemic, Peng was given "two options": (1) to quit as of December 31, 2020, take a "package," and sign a full general release of any and all claims or (2) to transfer from the Chicago to the New York office.  Such a transfer she was told would require her to be available on little or no notice to be physically present in MSUSA's New York offices.  Never mind that MSUSA was not working in its New York office (and is still not nine months later, due to the Pandemic).  Peng would need to be available starting January 1, 2020, Monday through Friday and Saturday afternoons to go into the New York office on short notice for in person meetings.  She had to move to the New York area or reside five (5) or six (6) days per week in the New York area.  She was not required to move to New York fully, so long as she was available as stated above.

90.     The transfer was not a *bona fide* offer of continued employment, nor was intended to be.  MSUSA knew that it was grossly unacceptable to Peng.  Peng and her husband live in Chicago with their four-year-old son and Peng's husband is a self-employed owner of an established construction company in the Chicagoland area.  Further, they knew that the New York office would not reopen for an indeterminate time period, and nobody was allowed into the office.  Still the January requirement remained, however.  Peng had successfully worked from home remotely for months and before that, for years she worked remotely from her home a significant amount of time.

91.     Nevertheless, when she asked for the details of her employment if she accepted the transfer, she was provided with one page of the policy handbook regarding moving expense reimbursement for employees relocating from one MSUSA office to another.  Apparently, MSUSA had no intent whatsoever in Peng relocating because none of her concerns were taken into account or addressed.  The "relocation" package would have MSUSA picking up by the

charges of a moving company from Chicago to New York and provided up to $15,000 for sundry moving expenses, only.  Missing from this *disingenuous offer* was: (1) any promise of the continuation of employment after relocation, (2) any compensation promises, and (3) any concern about the health fears that were obvious in late 2020 and the first quarter of 2021. Indeed, only when she *asked* if her employment would continue after JFY 2020 ended, was she told there were "no promises," including no promises to whether she would receive a bonus for her extensive efforts during JFY 2020 during the Covid-19 Pandemic, or would continue to be employed.

92.     She was told that MSUSA was closing its Chicago Office "to save money" on real estate.  Not only was this claim by MSUSA observably untrue, the Chicago office – on two full floors of 311 South Wacker Drive in the Loop – remains in place, subject to Covid-19 limitations. Indeed, the "closure" was affecting only Peng and Wright and the other three professionals in PUG's Chicago team.

93.     For his move, Grosshans allegedly had "accepted" the transfer.  This acceptance, of course, does not mean he "embraced" the transfer, as he told Peng he would commute to New York when not "on the road."  As a managing director and a calling officer, as well as Head of PUG, Grosshans was paid at least three times Peng's compensation, travelled throughout the country probably 75% of the time anyway, and would certainly be calling his own meetings in New York when he saw fit and was there.

94.     Shortly thereafter, a Mizuho Vice Chairman – the person in charge of Mizuho's business in all of Europe – publicly announced that Mizuho was not trying to save money on real estate by closing offices.  Indeed, it was not closing offices at all.  Savings would be achieved by staff reductions apparently, because those would be the only other significant business cost. MSUSA's cover was blown.  Internally, MSUSA had the gall to tell employees to disregard what

the Vice Chairman had said publicly to the world on Bloomberg News.  But there were clearly no real estate savings to be gained by "closing" PUG in Chicago.  The two floors occupied by MSUSA had just been recently re-leased for another 10-year lease.  The only "savings" were to be from the reductions of employee costs, which would be achieved by terminations and skimpy or zero bonuses.

95.     When Peng explicitly complained about race discrimination through counsel, Mizuho retaliated against her by excluding her from internal meetings, withdrawing the "severance offer," and terminating her employment, effective December 11, 2020.

96.     Peng was undercompensated from at least JFY 2017 in bonuses, and in total compensation.  The differences were significant and in total lower than other, white executive directors at MSUSA.  In fact, despite all executive directors in MSUSA investment banking enjoying the same base salary of $250,000 per year, Peng's total compensation or "total reward," the metric used by MSUSA to describe compensation to individuals, was generally 40%-50% below that of white executive directors.

**_Lisa Wright_**

97.     MSUSA and BKUSA discriminated against Wright based on her race, Black/African American, as well as retaliated against her for opposing discrimination.

98.     Wright joined MSUSA in 2016 as an associate.  She was very experienced and well-educated.  She was termed a "dual hat" employee, but was working in PUG in investment banking in a client facing role.  She had worked in college and after at Merrill Lynch & Co. (New York) and at Goldman Sachs & Co. (New York and London, U.K.).  After graduating with a B.S. degree with honors in 2006 from the Kelley School of Business at Indiana University, she had worked for J.P. Morgan Chase & Co. in Chicago (2006-2007) and at J.P. Morgan Securities, Inc.

in Hong Kong (2007 and 2008). She joined a boutique investment bank in Chicago, Loop Capital Markets, LLC ("Loop"), and worked in the corporate investment banking department at Loop for almost five years in mergers and acquisitions, managing deal teams of three to five professional employees, interacting with clients and executing all phases of merger and acquisition transactions. Prior to MSUSA, she had not focused exclusively on the Power and Utilities Sector, but was involved in significant transactions in other sectors as well. She entered the University of Chicago's prestigious Booth School of Business in 2014 and received her Master of Business Administration degree in June 2015. Also in 2015, she started Lazarus Holdings Corp. to locate, acquire, manage, and grow small businesses in the insurance services sector. Shortly after that business closed due to the unexpected illness of one of the participants in a potential acquisition, and she was hired by MSUSA as an associate in the investment banking business in Chicago, specifically to work in PUG.

99.    After a few months, in the spring of 2017, Wright was promoted to vice president.

100.   On April 1, 2018, Kris Grosshans became the head of PUG and, in December 2018, Wright's primary employer became MSUSA (although she remained employed by BKUSA in the "dual hat" capacity).

101.   Grosshans made no secret of his biased feelings toward Black people, and Wright, by making racist comments, as well as including in Wright's performance reviews untrue criticisms grounded in race-based stereotypes. Indeed, his criticisms were over subjective issues and even then mainly over issues that he could only speculate about because he had little or no direct knowledge of what he "saw." These criticisms appear to have been uniquely leveled at Wright and not at white employees. Frequently, Grosshans borrowed from office scuttlebutt but never had fact-based support. The fact that Wright was extremely well-spoken and presented

reasoned, analytical responses both orally and in writing to the criticisms only seemed to strengthen Grosshans's resolve to diminish Wright.  He even began to critique and criticize her responses to his criticisms.  He severely cut her bonus compensation as a result, even though it was already less than white vice presidents in PUG and MSUSA.  He criticized her delegation of assignments to juniors, over whom she supervised appropriately and professionally, with barrages of subjective, unanswerable, unsupported, racially stereotyped critiques.  Thus, he attacked her for "needing greater engagement" with colleagues, a comment that was clearly not measurable in any way.  Grosshans claimed *"I see* very little interaction with her peers…." (emphasis added). Obviously, the key to this comment is what Grosshans, who travelled 75% of the time, "saw."  He said she suffered from "insufficient initiation of regular communication and collaboration with [PUG] team members and product partners."  Again, there is no way to measure this criticism. According to Grosshans, she had "low visibility" at "industry conferences, client events and meetings."  Again unmeasurable.  Yet, Grosshans thought "she was quite defensive and generally closed to constructive criticism."  Grosshans himself ignored or rejected Wright's efforts to respond to criticisms, including the fact that the other PUG Managing Directors made clear they disagreed with Grosshans' negative critique of Wright.  In sum, if Wright spoke up and responded to these very non-quantifiable, subjective criticisms, she was "defensive" and deflective of "constructive criticisms."  Otherwise, he opined she did not care about the criticisms, was not engaged, or both.  She must be shirking her "work responsibilities," especially the highly questionable claim she was deficient for not socializing with the other white male vice presidents. When Michal Katz joined the firm in late 2019 as Head of Investment Banking and Grosshans' boss, Grosshans took the occasion to criticize Wright for not "enthusiastically embracing" and "presenting herself" as an experienced team member for the "organizational shift" to "advising

services," ostensibly because Wright did not deliver that message directly to Katz, which would have required vaulting over the three levels of bankers between Katz and Wright, including Grosshans. Nonetheless, Wright sought to talk with Katz on several occasions, but Katz repeatedly rejected Wright's attempt to talk with her. Indeed, Grosshans complained that Wright did not "offer" to "support me [Grosshans] and fellow teammates" in promoting "this new direction." His criticisms, focused largely on subjective areas of "initiative," "attitude," and "content," are simply stereotypical euphemisms for "lazy," "arrogant," and "stupid." None of those criticisms were fair, and each of them was racially motivated and evidence a racial bias from Grosshans.

102.    These biases were shared by other white, male employees and at the very least were openly tolerated by Grosshans.

103.    When Wright complained of discrimination, Mizuho retaliated by reducing her bonus compensation. At the end of JFY 2019, Wright received a severely reduced bonus from the prior year.

104.    In August 2020, Wright, like Plaintiff Peng, was told the Chicago office was closing and she could accept a package if she elected to quit or she could transfer to New York.

105.    Similar to Peng's case, there was no "content" to the transfer: no compensation, job security or promotion promises. The "offer" to transfer was really no offer at all. MSUSA hinted that "closing the Chicago office" was necessary to save money but told everyone displaced by this closing, that although they could transfer to New York, they had to do that by January 1, 2021, during the Pandemic, and with the New York office physically closed. As stated above, there were no real estate savings to be achieved by closing the Chicago office. Savings would be achieved only if the affected employees took the package and left. Meanwhile, MSUSA had hired a white managing director in New York and two white vice presidents to conduct the advisory business

that Wright was involved with.  In effect, MSUSA had replaced Wright before they let her go. Finally, other white PUG vice presidents were named on internal publications as "contributors" to Wright's own direct deals on which they had no involvement at all.

106.    After two months of negotiations over the "severance" package, Wright received a notice of termination, and the "package," which she was negotiating through counsel, was withdrawn.  Her last day was December 11, 2020, and her employment officially terminated on December 31, 2020.

107.    Her job functions have all been transferred to white people and, on information and belief, MSUSA continues to advertise for up to three additional vice president level employees to work in PUG.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Race Discrimination in Violation of 42 U.S.C. § 1981 (Chang)**

108.    Plaintiff Chang hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 107 with the same force as though separately alleged herein.

109.    42 U.S.C. § 1981 prohibits employment discrimination on the basis of race.

110.    Defendants violated § 1981 by denying Plaintiff Chang employment opportunities, including, but not limited to, the ability to be compensated at a rate commensurate with his production, namely, underpaying him regarding her JFY 2018, 2019, and 2020 bonuses; refusing to promote him (ultimately to managing director); and terminating his employment, all because of his race, in violation of 42 U.S.C. § 1981.

111.    As a direct and proximate consequence of Defendants' race discrimination, Plaintiff Chang has suffered, and continues to suffer, substantial damages, including, but not

limited to, back pay, front pay, and emotional distress and suffering, all in amounts to be determined at trial.

112.    Defendants' discriminatory treatment of Plaintiff Chang was willful, malicious, and in reckless disregard of Plaintiff Chang's protected rights.  Accordingly, Plaintiff Chang seeks an award of punitive damages against Defendants.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of 42 U.S.C. § 1981 (Chang)

113.    Plaintiff Chang hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 112 with the same force as though separately alleged herein.

114.    42 U.S.C. § 1981 prohibits employers from retaliating against an employee for making a complaint of racial discrimination.

115.    Plaintiff Chang properly complained to Defendants about race discrimination, through counsel.

116.    Defendants retaliated against Plaintiff Chang by deeming him ineligible for severance under the severance plan, denying him a JFY 2020 bonus, not paying him for his accrued vacation pay, and not providing him with healthcare.

117.    As a direct and proximate consequence of Defendant's retaliation, Plaintiff has suffered, and continues to suffer, substantial economic and non-economic damages, including, but not limited to, lost pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

118.    Defendants' retaliatory treatment of Plaintiff Chang was willful, malicious, and in reckless disregard of Plaintiff Chang's protected right to be free from retaliation.  Accordingly, Plaintiff Chang seeks an award of punitive damages against Defendants.

## THIRD CAUSE OF ACTION
### Race Discrimination in Violation of 42 U.S.C. § 1981 (Ntoso)

119.    Plaintiff Ntoso hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 118 with the same force as though separately alleged herein.

120.    42 U.S.C. § 1981 prohibits employment discrimination on the basis of race.

121.    Defendant MSUSA violated § 1981 by denying Plaintiff Ntoso employment opportunities, including, but not limited to, the ability to be compensated at a rate commensurate with his production, namely, underpaying him regarding his JFY 2018, 2019, and 2020 bonuses; refusing to promote him (ultimately to managing director); and constructively terminating his employment, all because of his race, in violation of 42 U.S.C. § 1981.

122.    As a direct and proximate consequence of Defendant MSUSA's race discrimination, Plaintiff Ntoso has suffered, and continues to suffer, substantial damages, including, but not limited to, back pay, front pay, and emotional distress and suffering, all in amounts to be determined at trial.

123.    Defendants' discriminatory treatment of Plaintiff Ntoso was willful, malicious, and in reckless disregard of Plaintiff Ntoso's protected rights.  Accordingly, Plaintiff Ntoso seeks an award of punitive damages against Defendant MSUSA.

## FOURTH CAUSE OF ACTION
### Race Discrimination in Violation of 42 U.S.C. § 1981 (Peng)

124.    Plaintiff Peng hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 123 with the same force as though separately alleged herein.

125.    42 U.S.C. § 1981 prohibits employment discrimination on the basis of race.

126.    Defendants violated § 1981 by denying Plaintiff Peng employment opportunities, including, but not limited to, compensation at a rate commensurate with the white executive

directors in MSUSA, and underpaying her regarding her JFY 2018, 2019, and 2020 bonuses and total compensation; refusing to promote her to managing director; and terminating her employment because of her race, all of which are in violation of 42 U.S.C. § 1981.

127.    As a direct and proximate consequence of Defendants' race discrimination, Plaintiff Peng has suffered, and continues to suffer, substantial damages, including, but not limited to, back pay, front pay, and emotional distress and suffering, all in amounts to be determined at trial.

128.    Defendants' discriminatory treatment of Plaintiff Peng was willful, malicious, and in reckless disregard of Plaintiff Peng's protected rights.  Accordingly, Plaintiff Peng seeks an award of punitive damages against Defendants.

## FIFTH CAUSE OF ACTION
### Retaliation in Violation of 42 U.S.C. § 1981 (Peng)

129.    Plaintiff Peng hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 128 with the same force as though separately alleged herein.

130.    42 U.S.C. § 1981 prohibits employers from retaliating against an employee for making a complaint of racial discrimination.

131.    When Peng explicitly complained about race discrimination through counsel, Mizuho retaliated against her by excluding her from internal meetings, withdrawing her "severance offer," and terminating her employment.

132.    As a direct and proximate consequence of Defendants' retaliation, Plaintiff Peng has suffered, and continues to suffer, substantial economic and non-economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

133.    Defendants' retaliatory treatment of Plaintiff Peng was willful, malicious, and in reckless disregard of Plaintiff Chang's protected rights.  Accordingly, Plaintiff Peng seeks an award of punitive damages against Defendants.

## SIXTH CAUSE OF ACTION
### Race Discrimination in Violation of 42 U.S.C. § 1981 (Wright)

134.    Plaintiff Wright hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 133 with the same force as though separately alleged herein.

135.    42 U.S.C. § 1981 prohibits employment discrimination on the basis of race.

136.    Defendants violated § 1981 by denying Plaintiff Wright employment opportunities, including, but not limited to, under compensating her relative to white vice-presidents regarding her JFY 2018, 2019, and 2020 bonuses; refusing to promote her managing director; and terminating her employment, all because of her race, in violation of 42 U.S.C. § 1981.

137.    As a direct and proximate consequence of Defendants' race discrimination, Plaintiff Wright has suffered, and continues to suffer, substantial damages, including, but not limited to, back pay, front pay, and emotional distress and suffering, all in amounts to be determined at trial.

138.    Defendants' discriminatory treatment of Plaintiff Wright was willful, malicious, and in reckless disregard of Plaintiff Wright's protected rights.  Accordingly, Plaintiff Wright seeks an award of punitive damages against Defendants.

## SEVENTH CAUSE OF ACTION
### Retaliation in Violation of 42 U.S.C. § 1981 (Wright)

139.    Plaintiff Wright hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 138 with the same force as though separately alleged herein.

140.    42 U.S.C. § 1981 prohibits employers from retaliating against an employee for making a complaint of racial discrimination.

141.    Plaintiff Wright properly complained to Defendants about race discrimination.

142.    When Wright complained of discrimination, Mizuho retaliated by reducing her bonus compensation, terminating her employment, and denying her a severance package.

143.    As a direct and proximate consequence of Defendants' retaliation, Plaintiff Wright has suffered, and continues to suffer, substantial economic and non-economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

144.    Defendants' discriminatory treatment of Plaintiff Wright was willful, malicious, and in reckless disregard of Plaintiff Wright's protected rights.  Accordingly, Plaintiff Wright seeks an award of punitive damages against Defendants.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  For the first cause of action, damages to be determined at trial;

B.  For the second cause of action, damages to be determined at trial;

C.  For the third cause of action, damages to be determined at trial;

D.  For the fourth cause of action, damages to be determined at trial;

E.  For the fifth cause of action, damages to be determined at trial;

F.  For the sixth cause of action, damages to be determined at trial;

G.  For the seventh cause of action, damages to be determined at trial; and

H.  For such other and further relief as the Court deems just and proper.

### [SIGNATURE ON FOLLOWING PAGE]

Dated: New York, New York
April 30, 2021

**THE LIDDLE LAW FIRM PLLC**

By:    s/ Jeffrey L. Liddle
        Jeffrey L. Liddle
        Edgar M. Rivera
        1177 Avenue of Americas, Fl. 5th
        New York, NY 10036
        646-452-7211
        jliddle@liddlelaw.com
        erivera@liddlelaw.com

*Attorneys for Plaintiff*