USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _3/31/2026_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NELSON CHANG, et al.,

                                        Plaintiffs,

                        -against-

MIZUHO SECURITIES USA LLC and MIZUHO
BANK (USA),

                                        Defendants.

21-CV-03874 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

This is an employment discrimination lawsuit.  Plaintiffs are Nelson Chang, Kwaku Ntoso, Jia Peng, and Lisa Wright.  Defendants are their former employers, Mizuho Securities USA LLC and Mizuho Bank (USA) (together, "Mizuho").  Plaintiffs allege Mizuho discriminated against them by paying them less than similarly situated white peers, failing to promote them, and terminating their employment.  All Plaintiffs allege discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, while Chang and Ntoso also allege discrimination in violation of the New York City Human Rights Law ("NYCHRL").  Chang, Peng, and Wright also allege Defendants retaliated against them for complaining about discrimination, in violation of Title VII and Section 1981 (Chang also alleges retaliation in violation of the NYCHRL).  Lastly, Plaintiffs bring common law claims of unlawful termination, breach of implied contract, and failure to make severance payments. Before the Court now is Defendants' motion for summary judgment.  For the following reasons, the motion is GRANTED.

## BACKGROUND

### I.    RELEVANT FACTS[1]

#### A.  Mizuho's Business and Compensation Structure

Mizuho's operations included a banking division that functioned as a corporate and investment bank. SOF ¶ 9. The banking division hosted numerous industry and product groups, including one called the Power and Utilities Group ("PUG"). *Id.* ¶ 14. PUG was headed by an individual named Brady Sadek, who began transitioning towards retirement in late 2017 or early 2018. *Id.* ¶ 17. His replacement was an individual named Kris Grosshans. *Id.* ¶¶ 18, 20. Plaintiffs were employees in PUG.

Mizuho's compensation had two elements: base salary, and incentive-based compensation, *i.e.*, bonuses. Dkt. No. 140-11 at 3. Per Mizuho's compensation policy, bonuses were "discretionary" and "varie[d] according to Bank, group and individual performance." *Id.* For bankers, Mizuho determined total annual compensation via an interactive process involving input from group heads, the chief operating officers, and human resources ("HR"). SOF ¶ 83. Bonuses were decided using several factors, including Mizuho's overall performance, group performance, and individual performance. *Id.* ¶ 88. In determining bonuses, Mizuho utilized a "total compensation approach," meaning an employee's bonus amount took into account base salary amount to ensure the "total compensation" an employee received reflected his or her productivity and contributions. *Id.* ¶ 85.

---

[1] The following facts are taken from the Rule 56.1 Statement Defendants submitted, with Plaintiffs' responses (Dkt. No. 149, "SOF") where necessary, and, where the facts are undisputed or not materially disputed, with evidence from the record. The Court refers to the memoranda of law in support of and in opposition to the motion for summary judgment as follows: Defendants' memorandum of law supporting their motion for summary judgment (Dkt. No. 130) as "Mot."; Plaintiff's opposition (Dkt. No. 148) as "Opp."; and Defendants' reply (Dkt. No. 154) as "Reply."

Offer letters Mizuho issued (including those to Plaintiffs) confirmed compensation consisted of a salary and discretionary bonus, "the award and amount of which will be at the sole and absolute discretion of management." *See, e.g.*, Dkt. No. 140-1.  These offer letters also made clear that employees were "at will," meaning Mizuho could terminate employment without cause. *Id.* at 3.  The letters further specified "the 'at will' nature of your employment may only be changed in an express written agreement." *Id.*  It specified that no employee was entitled to severance payments upon termination unless, *inter alia*, their employment was terminated without cause and the employee executed "an Effective General Release Agreement." *Id.* at 5. The letters specified no employee was eligible for a bonus if they no longer were employed by Mizuho when annual bonuses were paid. *Id.*  Finally, each offer letter included an arbitration clause. *Id.*

### B. Facts Specific to Each Plaintiff

#### 1. Nelson Chang

Nelson Chang is an Asian-American man and began his career with Mizuho in 2003 in the Credit Products Group ("CPG").  Around 2018, a reorganization effort prompted major changes in CPG and many employees were either transferred or terminated.  SOF ¶¶ 43–45. Mizuho's Chief Operating Officer Peter Calistri testified that Chang was spared from termination and transferred to PUG because he was a very good credit officer, well-liked, and had the support of management. *Id.* ¶ 45.  Chang joined PUG in 2018 as an Executive Director[2] and began reporting to Grosshans. *Id.* ¶¶ 47–48.  Chang testified that both Sadek and Grosshans were supportive of his move to PUG. *Id.* ¶ 44.

---

[2] As relevant to this case, at Mizuho "Managing Directors" were above "Executive Directors" who were above "Vice Presidents."  Various other roles, including "Associate" and "Analyst," ranked below Vice Presidents.

Although Chang received strong performance reviews, the reviews consistently indicated that Chang continued to perform a "support" role while working in PUG and performed similar duties to when he was in CPG, which emphasized "analyzing and executing" on credit transactions that client coverage teams originated. His 2018 performance review and self-assessment highlighted Chang played a "support" role to managing directors on the team. SOF ¶ 389. His self-assessment also highlighted that he continued to perform the same functions as when he worked in CPG. *Id.* His 2019 performance review noted Chang still continued to play a "supporting role" and noted Chang needed to "deemphasize [his] legacy support of the Portfolio." *Id.* ¶ 390.

In 2020, Calistri informed senior management they should "identify lower performing individuals and consider exiting" them, citing Chang as an example of an "[u]nderperforming resource." SOF ¶ 393. Grosshans advocated on Chang's behalf, but senior management concluded Chang was not originating business at a sufficiently high level to remain in his title at PUG. *Id.* ¶ 397. Around this time, the Corporate Credit Structuring ("CCS") team, which was the successor to CPG, was experiencing staff shortages. The Head of Investment & Corporate Banking at Mizuho Americas, Michal Katz, emailed Grosshans on July 31, 2020, stating they should discuss if Chang was best positioned for CCS. Ultimately, around January 2021, Grosshans and Chris Stolarski, the Head of Infrastructure Banking, conducted multiple meetings with Chang advising him he would be transferred to CCS. SOF ¶¶ 399, 401–11, 413–30. Chang took notes after the call. His notes reflect his understanding there was "no other option" besides him transferring to CCS.

During these calls, Grosshans and Stolarski represented to Chang his base salary, title, and potential for promotion would be the same after he transferred; his 2020 bonus, if he

4

accepted the transfer, would be based largely on the ten months he spent in PUG; and the same factors would be used to determine his bonus prospectively. SOF ¶¶ 418–30. Despite these assurances, Chang viewed the transfer as a demotion because the offered position was currently held by a Vice President. TAC ¶ 74.[3] In the Third Amended Complaint, Chang alleged for the first time that during one of these calls Grosshans reported that Katz wants "people who look like Whitcher," referring to a white male managing director in PUG with experience in mergers and acquisitions ("M&A"). *Id.* ¶ 73.

Chang promptly retained an attorney named Jeffrey Liddle,[4] who sent a letter to Mizuho's in-house counsel on January 30, 2021 (the "Letter"). The Letter states that it "and our conversations constitute an unequivocal declaration of Mr. Chang's right to be free of employment discrimination under federal, state, and city law. As such, he is also protected against retaliation." *See* Dkt. No. 150-30. On January 31, 2021, Mizuho's in-house counsel responded that, because Chang was rejecting the transfer, his employment was being terminated effective February 1, 2021. SOF ¶ 442. The response also indicated that Chang was ineligible for severance benefits but could receive a separation payment of $250,000, if he agreed to sign a separation agreement and release. *Id.* ¶ 443. Chang did not do so and he was terminated as of February 1, 2021. Because he was terminated before Mizuho paid its 2020 bonuses, per Mizuho policy he did not receive any bonus compensation for 2020.[5]

---

[3] Chang testified: "I said that this was an insulting offer and a demotion. I was being asked to return to a team and assume a role that I had previously managed and that role was previously offered to two other people who were at the [Vice President] level." Dkt. No. 140-6 at 157:6–12.

[4] Mr. Liddle also represented all Plaintiffs in this lawsuit, until he had to withdraw as counsel due to his disciplinary suspension from the practice of law (unrelated to this case) in late 2024.

[5] In the Third Amended Complaint, Chang alleges that a Mizuho employee named Ray Ventura in 2012 called Chang a "Chinaman," referred to Chang as "[his] bitch" in 2015, and discussed the size of his own genitals in 2018 in connection with his Italian heritage. TAC ¶¶ 65–66; 68. Plaintiffs allege Michael Donohue, a white male Managing Director in PUG, also made numerous racially insensitive

## 2. Kwaku Ntoso

Kwaku Ntoso is an African American man and joined Mizuho in 2011 as an Assistant Vice President in the Corporate Finance Advisory and Solutions ("CFAS") group. *Id.* ¶ 24. Grosshans and Sedak recruited Ntoso into PUG in 2013. *Id.* ¶¶ 28–29. Ntoso was promoted to Vice President in 2013, to Director in 2018 and then to Executive Director in 2019. *Id.* ¶¶ 25, 31–34.[6] Ntoso was a strong performer in PUG and made known his goal to be promoted to Managing Director. *See, e.g.*, Dkt. No. 140-5 at 118:15–19. To achieve his goal, Ntoso sought to be named "primary banker" for several accounts. *Id.* at 108:14–25. In Ntoso's 2018 performance review, Grosshans wrote Ntoso was positioned to take on increased client coverage responsibility in 2019. SOF ¶ 209. Ntoso also testified that Donohue was "generally supportive" of Ntoso taking the lead with clients. *Id.* ¶ 215.

Ntoso alleges Grosshans "promised in writing that Ntoso would be named the primary banker for six specific accounts and that the revenue from these accounts would be credited to Ntoso." TAC ¶ 91. Asked about this conversation, Grosshans testified he and Ntoso discussed "specific names for [Ntoso] to take ownership of and to be the first call from the client, and vice versa, and for him to develop around those names as an intermediate step to becoming promoted." SOF ¶ 209, 212. But he denied telling Ntoso he would be named "primary banker"

---

comments, including calling Chinese food "chicken elbows" or doing an exaggerated Asian accent. *Id.* ¶¶ 69–72. Neither Ventura or Donohue made any employment or managerial decisions relevant to this lawsuit. Chang testified he did not raise any of Donohue's comments to HR, but he did report them to Brady Sadek, then head of PUG. *See* Dkt. No. 140-6 at 138:14–19. Chang also testified about one incident where, in 2017, Chang mentioned to Grosshans that they would have more diversity in their recruiting if they hired from Penn State and Grosshans looked out across the summer class of interns and—while speaking to Chang—asked, "where are all the white kids[?]" *Id.* at 117:15–118:7. This comment was undoubtedly inappropriate, but does not indicate Grosshans harbored a discriminatory attitude about Asians.

[6] Plaintiffs seemingly dispute that Ntoso became an Executive Director in 2019, although it is unclear on what basis. *See* SOF ¶ 32 response; ¶ 34 response.

on those accounts. *Id.* During his deposition, Ntoso testified he did not recall if Grosshans promised to make him the primary banker for the six specific accounts. *Id.* ¶ 211. The record is clear no accounts were handed over to Ntoso. There is no evidence of any "promise[] in writing" to make Ntoso a primary banker on these accounts.

In 2019, Ntoso received an offer to interview with a competitor of Mizuho. *Id.* ¶ 326. Ntoso proceeded to interview with the competitor for roughly nine months and received an offer on November 10, 2020, with significantly higher compensation than he was receiving at Mizuho. *Id.* ¶¶ 330–45. On November 13, 2020, Ntoso informed Grosshans of the offer and submitted a list of requests necessary for him to stay at Mizuho, including "some type of . . . monetary demonstration that [Mizuho] wanted to retain [him.]" *Id.* ¶¶ 358, 360. During Ntoso's deposition, he testified he would have stayed at Mizuho if management agreed to his requests because he was generally happy and liked the job and many of the people he worked with. *Id.* ¶ 359. Ntoso submitted a resignation letter after Grosshans and Calistri opted against granting the requests. *Id.* ¶ 369

Ntoso alleges "[t]he reason Grosshans refused to live up to his promise and name Ntoso the primary banker on the accounts was due to his race and/or color." TAC ¶ 107. Ntoso also alleges "Grosshans expressed fear that an African American as the primary banker for the accounts would not be acceptable to clients." *Id.* But there is no evidence for these allegations. Grosshans denied this statement at his deposition. During Ntoso's deposition, he testified he did not hear Grosshans or anyone in management make discriminatory comments about African Americans. SOF ¶¶ 382–85. Ntoso did not complain about discrimination to human resources or any other management employee during his tenure at Mizuho. SOF ¶¶ 380–81.

### 3. Jia Peng

Jia Peng is an Asian woman who joined Mizuho in the CFAS group in 2013. She first lived in New York and then moved to Chicago a year into her tenure at Mizuho. *Id.* ¶ 51. Peng was promoted to Executive Director in June 2016. *Id.* ¶¶ 52–53. She joined PUG in 2018. *Id.* ¶ 56.

In 2020, two white men were hired into PUG as Managing Directors, from outside Mizuho: James von Riesemann and David Whitcher. *Id.* ¶ 167. Both men had previous experience working as managing directors. Von Riesemann, for example, had worked as a managing director since 2009. Dkt. No. 140-47. Defendants contend that Katz wanted to make PUG more competitive in classical investment banking areas, and accordingly hired Whitcher given his background in M&A and von Riesemann given his background in equity capital markets. *See* SOF ¶ 161. This contention is corroborated by instructions the banking division gave to its retained executive search firm in 2019 to focus on "investment bankers" and shift away from candidates with "corporate banking backgrounds." *Id.* ¶ 160. Katz also spoke publicly about this strategy during a town hall meeting in February 2020. *Id.* ¶ 155.

Peng alleges Whitcher, von Riesemann, and Grosshans would interrupt her while speaking and engaged in derogatory and disrespectful behavior. *See* TAC ¶ 122. She also alleges Grosshans would give her reviews that played on racial stereotypes and tropes, namely that Peng was good with numbers but lacked client-relations skills. *Id.* ¶ 120. She alleges Whitcher excluded her from M&A planning meetings. *Id.* ¶ 131. Plaintiffs also generally allege Mizuho "passed over" Plaintiffs by hiring Whitcher and von Riesemann, who Plaintiffs suggest were underqualified for the Managing Director positions or, at a minimum, no more qualified than Plaintiffs as internal candidates for promotion. However, there appears to be no evidence

8

that anyone at Mizuho considered <u>any</u> internal candidate for the roles that von Riesemann and Whitcher were hired to play.

In 2019, Mizuho developed a plan to centralize banking operations in core office locations, such as New York, and close other offices, including its Chicago office. SOF ¶ 266. In October 2019, Calistri approved a plan to "shift the Chicago operations and centralize them" in New York. *Id.* ¶ 268.

The Chicago office had six bankers at that time. In July 2020, human resources informed the six Chicago-based bankers that Mizuho was closing the Chicago office effective December 31, 2020, and they needed to be able to report to the New York office beginning on January 1, 2021, COVID-19 restrictions permitting. *Id.* ¶¶ 269, 272. HR also informed the bankers that—if they did not wish to transfer their employment, they could resign and receive a separation package so long as they executed a separation agreement. *Id.* ¶ 272. The separation package totaled four weeks base pay for each year of service plus seventy-five percent of the bonus for the 2019 financial year. Dkt. No. 124-43. The initial severance offer required employees to elect the severance package and sign the agreement by August 31, 2020. *Id.*

A white male Vice President attempted to negotiate a different separation package, but HR informed him the separation package was non-negotiable. SOF ¶ 276. That Vice President and a white male Associate executed separation agreements on August 31 and September 10, 2020, respectively. *Id.* ¶¶ 280–81. A Hispanic male Chicago-based banker executed a separation agreement on September 3, 2020. *Id.* ¶¶ 270, 278. Grosshans—who was also based in Chicago—transferred his employment to New York and was required to report to the New

9

York office except when he was traveling to meet with clients. *Id.* ¶ 284. Grosshans was not required to move his residence to the New York area, so long as he met these conditions.[7]

Peng retained attorney Jeffrey Liddle in late July or August to negotiate with Mizuho. Subsequently, Mizuho extended Peng's deadline to make her transfer/severance decision until September 7, 2020. *Id.* ¶ 291. Mizuho's in-house counsel contacted Mr. Liddle on September 9, 2020, stating they needed to know Peng's "decision as soon as possible as the business will need to know whether they should expect her to relocate and continue employment past 12/31 or not." *Id.* ¶ 292.

Peng contacted Katz directly on October 1, 2020, to discuss the direction of PUG, the rationale behind consolidating the offices, and Peng's future with Mizuho. *Id.* ¶ 293. The two spoke on October 7, 2020. *Id.* ¶ 294. Peng testified that, during the call, Katz stated, "I hope you join us." *Id.* ¶ 295.

By November 20, 2020, over two months after the extended deadline passed, Peng still had not elected to transfer or receive a separation package. Accordingly, HR emailed Peng stating, "we have previously extended the deadline . . . . That deadline has now long passed. To date, you have neither accepted that offer nor the alternative offer of a separation package. Accordingly, your employment will end on December 31, 2020[,] without a separation package." *Id.* ¶ 297.

---

[7] An October 22, 2019 email discussing how Grosshans would be affected by the Chicago office closure stated, "[g]iven his client travel scheduled, he will have flexibility to work from Chicago (without an admin)[.] Otherwise he will be expected to be working out of the NY office as close to full time." Dkt. No. 140-49 at 2. Grosshans testified he did not have the option to work in Chicago and Katz "wanted me to prioritize being on the road with clients. And when I'm not with clients, she expected me to be in New York, which is exactly what I do."). Dkt. No. 140:48 at 226:5–12.

### 4. Lisa Wright

Lisa Wright is an African American woman who joined Mizuho in 2016 as an Associate in PUG in the Chicago Office. *Id.* ¶¶ 59–60. She was promoted to Vice President in 2017. *Id.* ¶ 62. After Grosshans took over PUG in 2018, he gave Wright several critical performance reviews. In those reviews, he advised that Wright needed to prioritize mentoring junior team members and stated Wright had a "general lack of awareness and attention to her colleagues that is not consistent with the team atmosphere and culture" Grosshans wished to foster. *Id.* ¶¶ 255–56. In 2019, her reviewers concluded that these and similar issues meant "her performance does not support her request for promotion to Director as stated in her FY19 self-assessment. In order to be considered for promotion to Director, significant improvement on the items noted above will be required in order to achieve success." *Id.* ¶ 261. Wright contends this negative feedback derived from Grosshans' negative perceptions of African American women. Wright complained in 2018 and 2020 to HR about performance reviews and she testified that, while speaking with HR in mid-2020, she complained about being treated worse based on her race and gender. Dkt. No. 140-13 at 223–25.

Like Peng, in July 2020 Wright received notice that the Chicago Office was closing and she needed to (i) report to the New York Office starting in January 2021, (ii) accept a separation payment if she signed a separation agreement, (iii) resign, or (iv) be terminated. SOF ¶¶ 270, 272.

On September 11, 2020, an internal message from HR stated, "Lisa Wright has decided not to relocate but she would like to discuss the amount offered." *Id.* ¶ 307. On November 20, 2020, Wright still had not signed a separation agreement, and she received the same email as Peng from HR stating the extended deadline had long passed and her employment would end on December 31, 2020, without a separation package. *Id.* ¶ 315.

11

## II.    PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on April 30, 2021.  Motion practice and amendments yielded the operative Third Amended Complaint (Dkt. No. 56).  It alleges racial discrimination in violation of Section 1981, Title VII, and the NYCHRL (for Chang and Ntoso) on the theory that Defendants failed to promote Plaintiffs, underpaid them relative to white Executive Directors or white Vice Presidents, and terminated them on account of their race.  Chang, Peng, and Wright also allege Defendants retaliated against them for complaining about race discrimination, in violation of Section 1981 and Title VII.  Chang also brings a retaliation claim under the NYCHRL.  The Third Amended Complaint also includes three common law claims.  Count Twenty alleges termination without justifiable cause.  Count Twenty-One alleges failure to pay bonuses in accordance with bonus plans for the 2018, 2019, and 2020 financial years.  Count Twenty-Two alleges nonpayment of separation pay.  Additionally, in Count Twenty-Three, Wright alleges non-payment of severance pay in violation of ERISA.

Following the close of discovery, Defendants moved for summary judgment on all claims.  Dkt. No. 117.

### DISCUSSION

This Opinion proceeds in four parts.  First, it dismisses each Plaintiff's discrimination claims under Section 1981 and Title VII.  Second, it dismisses Chang, Peng, and Wright's retaliation claims.  Third, it dismisses Chang and Ntoso's NYCHRL claims.  Fourth and last, it dismisses the common law claims and Wright's ERISA claim.

## I.    LEGAL STANDARD ON SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court shall grant summary judgment when "the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[8] "A fact is 'material' when it 'might affect the outcome of the suit under governing law.'" *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)). In determining whether a genuine issue of material fact exists, "[t]he evidence of the nonmovant is to be believed," and a court must draw "all justifiable inferences" in favor of the nonmovant. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

Once the movant has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in [the nonmovant's] favor." *Anderson*, 477 U.S. at 256. Reliance upon "conclusory statements" or "mere allegations" is not sufficient to defeat summary judgment. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532–33 (2d Cir. 1993).

"Employment discrimination cases raise special issues on summary judgment." *Kenney v. N.Y.C. Dep't of Educ.*, No. 06-CV-05770, 2007 WL 3084876 (HB), at *3 (S.D.N.Y. Oct. 22,

---

[8] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

13

2007). And courts must be wary about granting summary judgment in a dispute that turns principally on an employer's intent and motivation. *Id.* Nevertheless, the Second Circuit has gone "out of [its] way to remind district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## II.    SUMMARY JUDGMENT IS GRANTED FOR DEFENDANTS ON PLAINTIFFS' DISCRIMINATION CLAIMS UNDER SECTION 1981 AND TITLE VII

Plaintiffs each allege racial discrimination in violation of Title VII and Section 1981. Title VII makes it unlawful to discharge any individual due to race or sex. 42 U.S.C. § 2000e-2(a)(1). Section 1981, meanwhile, "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004).

A court assesses Title VII and Section 1981 employment discrimination claims under the burden-shifting *McDonnell Douglas* framework in the absence of "direct evidence of discrimination." *Weaver v. Bloomberg L.P.*, 717 F. Supp. 3d 372, 383 (S.D.N.Y. 2024); *Gertskis v. NYC D.O.H.M.H.*, 375 F. App'x 138, 138 (2d Cir. 2010) (clarifying that *McDonnell Douglas* applies to employment discrimination claims under Section 1981); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, a plaintiff has the burden of establishing a *prima facie* case of discrimination by demonstrating:

> (1) she belonged to a protected class; (2) was qualified; (3) suffered an adverse action; and (4) the adverse action occurred under circumstances giving rise to an inference of discriminatory intent.

*Gueye v. Peoples United Bank, Nat'l Ass'n*, No. 21-1250, 2022 WL 2203953, at *1 (2d Cir. June 21, 2022). If a plaintiff does so, "a presumption of discrimination arises" and the burden shifts to

14

a defendant, "who must proffer some legitimate nondiscriminatory reason for the adverse action." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).  If a defendant meets that burden, the presumption of discrimination disappears, and the defendant is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Id.*  This showing requires that the plaintiff "demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant is actually pretext for discrimination." *Id.*

Plaintiffs advance three theories of racial discrimination: discriminatory termination; failure to promote; and disparate pay.  The Court considers each in turn.

## A. Discriminatory Termination

Plaintiffs first allege Defendants terminated their employment on account of their races. No Plaintiff can succeed on this theory.

### 1. Ntoso

Ntoso alleges Defendants "constructively terminate[d] his employment by materially breaching promises to him," which seemingly refers to Grosshans' alleged promise to give Ntoso primary responsibility for several accounts.  TAC ¶ 202.  Constructive discharge "occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.  Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Serricchio v. Wachovia Secs. LLC*, 658 F.3d 169, 185 (2d Cir. 2011).  Ntoso has failed to show intolerable working conditions.

Ntoso alleges he left Mizuho because he did not think he would have opportunities for advancement.  *See* TAC ¶ 108 ("Ntoso resigned with no hope for a future at [Mizuho].").  That allegation is irreconcilable with the notion that he left due to an intolerable work environment at

15

Mizuho.  The record is also clear Ntoso interviewed for a new job for months while at Mizuho and, once he had an offer from the new job with higher pay, attempted to negotiate to stay at Mizuho for a comparable raise in compensation.  No reasonable jury could infer that Ntoso felt compelled to leave Mizuho due to an "intolerable" work environment when he spent months interviewing for a new position and then used the new position to negotiate for an offer to stay at Mizuho.  *Tepperwien v. Entergy Nuclear Operations, Inc.*, 606 F. Supp. 2d 427, 447 (S.D.N.Y. 2009) ("[T]hat Plaintiff apparently began searching for another job while he remained employed . . . militates against his constructive discharge claim.").  Finally, Ntoso testified he was happy at Mizuho and would have stayed had management agreed to some of his requests.  SOF ¶ 359.

### 2.  Peng and Wright

Unlike Ntoso, Mizuho actually terminated Peng and Wright's employment. Nevertheless, neither Peng nor Wright can establish a *prima facie* case of discrimination under a termination theory.

Peng and Wright worked in the Chicago office in July 2020.  Accordingly, both Peng and Wright (as with all other Chicago bankers) were told they either had to report to the New York office beginning in January 2021 or could receive a separation package if they signed Mizuho's separation agreement.  Remaining in their jobs in Chicago was not one of the available options. Wright informed Mizuho that she would not transfer to New York, and her employment ended in December 2020.  Peng failed to make an election to either transfer or receive a separation package, so HR informed her in November 2020 her employment would end in December 2020. Neither Peng nor Wright signed a separation agreement, hence did not receive separation packages.

Mizuho made a business decision as early as 2019 to consolidate its banking activities in the New York office and close the Chicago office.  The genesis of this decision, its rationale, and

its execution are well documented in the record.  Nothing about the decision bespeaks a discriminatory intent.  Furthermore, all bankers in Chicago, regardless of their race, received the same option to transfer to New York or sign a separation agreement to receive a separation package.  Of the six affected bankers, three were white men.  Of those three, two accepted severance packages and ended their employment rather than relocating.  SOF ¶¶ 270, 275, 280–82.  Mizuho's HR also rebuffed efforts by one white Vice President to negotiate a different severance package.  *Id.* ¶ 276.  And Peng and Wright received the same terms as white employees.  Plaintiffs can point to nothing in this fact pattern evincing discrimination.

In opposition, Peng and Wright say the terms of transfer were "selectively enforced" because Grosshans "was allowed to remain in place."  Opp. at 38.  This argument ignores that Grosshans <u>was</u> required to report to the New York office on any day he was not traveling for client work; the only concession was that he was not required to relocate his residence.  Furthermore, it ignores that—even if Grosshans did receive different terms than Peng or Wright—this would not create an inference of discrimination given he headed PUG and was Peng and Wright's boss, and thus was not comparably situated to Peng, Wright, or the other subordinate bankers in Chicago.  Additionally, the record is clear that all other bankers in the Chicago office received the same offer to either transfer to New York or accept a severance package.

Peng and Wright also argue that junior white male employees received higher severance bonuses and "[t]hese discrepancies in exit treatment further support a finding of pretext."  Opp. at 38.  But this argument ignores that the severance bonus was calculated in the same manner for all employees: "4 weeks base pay each of year of service" plus "75% of FY 2019 Bonus."  *See*

17

Reply at 7.  Hence, while this argument may be relevant to Peng and Wright's disparate pay theory, it cannot save their discriminatory termination theory.

### 3.  Chang

Chang also alleges Defendants terminated him because of his race, although under different circumstances than Peng and Wright.  Defendants attempted to transfer Chang from PUG to CCS, where he would have kept the same title, received the same compensation, and worked in the same office location.  After Chang refused the transfer, Defendants terminated his employment.

Chang's transfer from PUG to CCS does not qualify as an adverse employment action given Chang cannot identify how the transfer would have harmed him.  *See Watson v. Paulson*, 578 F. Supp. 2d 554, 564 (S.D.N.Y. 2008), *aff'd sub nom.* 355 F. App'x. 482 (2d Cir. 2009); *Muldrow v. City of St. Louis*, 601 U.S. 346, 349 (2024) ("an employee must show some harm from a forced transfer to prevail in a Title VII suit" although the injury need not "satisfy[y] a significance test.").  Chang argues the transfer was a "demotion" to a "diminished back-office role" where he would receive "no bonus" and "fall from being next in line for Managing Director in PUG to fifth in line in CCS."  Opp. at 37.   But these arguments either contradict the record or have no basis therein.  Per Chang's own notes, Grosshans and Stolarski told Chang he would be paid the same salary, work in the same office, keep the same title, and receive the same bonus had he accepted the transfer.  SOF ¶¶ 418–30.  Although Plaintiffs maintain, despite these facts, that the transfer was a demotion, the only evidence offered in support is Chang's belief that the position had previously been offered to two people at the Vice President level, and was ultimately filled by someone at the Vice President level.  Dkt. No. 140-6 at 157:6–12.  But that testimony, which the Court credits for purposes of this motion, does not change the undisputed fact that the role was offered to Chang at the Executive Director level.  Furthermore, there is no

evidence corroborating Plaintiffs' unsupported allegation either that Chang was "next in line for Managing Director in PUG" or "fifth in line in CCS," Opp. at 37. Accordingly, the Court cannot infer that Mizuho's attempted transfer of Chang was an adverse action.

But even if the transfer were viewed as an adverse action, Chang cannot make a *prima facie* discrimination case regarding either the transfer or his termination. Although termination of one's employment is doubtlessly an adverse action, Chang cannot show it occurred in circumstances that evince discrimination. The Third Amended Complaint alleges numerous offensive comments about Asians by Donohue and Ventura, but Plaintiffs do not allege either man had a hand in offering the transfer or in terminating Chang's employment after he rejected it. The only evidence that hints at discrimination is Grosshans alleged statement, after Chang pushed back on the transfer, that Katz prefers people "who look like Whitcher" for the investment banking-oriented roles that Chang was being transferred away from. TAC ¶ 73. But this is a facially neutral statement susceptible to numerous, non-discriminatory interpretations. Furthermore, record evidence shows Defendants were expanding PUG to emphasize investment banking areas, which Whitcher specialized in. Therefore, Katz's comment could readily have referred to how Whitcher looked on paper as opposed to his race, and even drawing all inferences in favor of the Plaintiff, this lone remark does not support an inference of discriminatory intent, looking at the record as a whole.

Nevertheless, even assuming Chang could make a *prima facie* case of discrimination, Defendants have carried their burden of showing a non-discriminatory reason for the transfer and subsequent termination when the transfer was rejected. The record evidence showed that senior management had identified Chang as "underperforming" in PUG and determined Chang was not performing the tasks or role of a senior banker in a client-facing group. SOF ¶ 393. His

19

performance reviews also consistently noted that he played a "supporting role." Although Chang now disagrees with that assessment, the Court is not at liberty to second guess business decisions or business judgments of Defendants. Chang has not pointed to any evidence showing this explanation is pretextual, let alone a preponderance of such evidence. Therefore, he cannot show discrimination on a termination theory.

## B. Failure to Promote

Next, each Plaintiff alleges racial discrimination on a failure to promote theory. Chang, Ntoso, and Peng allege they should have been promoted to Managing Director, while Wright alleges she should have been promoted to Executive Director. Failure to promote can qualify as an "adverse action" necessary to sustain a discrimination claim. But it requires a plaintiff to show "(i) he is a member of a protected class, (ii) he applied and was qualified for a job for which the employer was seeking applicants, (iii) he was rejected for the position, and (iv) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Garrison v. Am. Sugar Ref., Inc.*, 789 F. Supp. 3d 291, 307 (S.D.N.Y. 2025). Alternatively, to satisfy the second prong, "a formal job application may not be required if the employee can demonstrate that (i) the vacancy at issue was not posted, and (ii) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Reyes v. City Practice Grp. of New York, LLC*, 2025 WL 388524, at *16 (S.D.N.Y. Feb. 4, 2025).

### 1. Chang, Ntoso, and Peng

Chang, Ntoso, and Peng have not stated a *prima facie* case for discrimination. None of them allege they applied for and were rejected from a Managing Director position. Indeed, the record reflects Defendants were not promoting anyone from within PUG to a Managing Director position and were instead making lateral hires as part of their efforts at diversifying the group's

20

areas of expertise.  Grosshans also testified that he did not recommend anyone for promotion to Managing Director, while he headed PUG.  SOF ¶ 204.

That Defendants hired Whitcher and von Riesemann—two white males—as managing directors does not evince discrimination, either.  Both individuals had prior experience as managing directors.  Von Riesemann, for example, had experience working as a managing director from as far back as 2009.  Dkt. No. 140-47.  Furthermore, both Whitcher and von Riesemann had specialties that neither Chang, Ntoso, or Peng possess, in M&A and capital markets, respectively.  Plaintiffs dispute the value of these areas of expertise to the work of PUG, but concede that senior management had decided that expertise was valuable.

Chang, Ntoso, and Peng also cannot show a failure to promote on a theory they were more talented.  "In the failure-to-promote context, a plaintiff who relies exclusively on her supposedly superior qualifications for the job as circumstantial evidence of discrimination . . . must present evidence that her credentials were 'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Faustin v. New York & Presbyterian Hosp.*, 2025 WL 1755192, at *5 (S.D.N.Y. June 25, 2025) (quoting *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 78 (2d Cir. 2016)).  Both Whitcher and von Riesemann had backgrounds in classical investment banking areas, which Plaintiffs did not.  And both Whitcher and von Riesemann had experience working as managing directors, with von Riesemann having served as a managing director since 2009.  *See* Dkt. No. 140-47.  Therefore, Chang, Ntoso, and Peng cannot show their credentials were so superior to Whitcher and von Riesemann's that no reasonable person could have chosen them over Chang, Ntoso, or Peng.

### 2. Wright

Turning to Wright, she does not allege either that she applied for an Executive Director position or that anyone else from PUG received a promotion or was hired into one during the relevant time period. Accordingly, she cannot establish a *prima facie* case of discrimination on a failure to promote theory. *Fletcher v. ABM Bldg. Value*, No. 14-CV-04712 (NRB), 2018 WL 1801310, at *11 (S.D.N.Y. Mar. 28, 2018), *aff'd*, 775 F. App'x 8 (2d Cir. 2019) (granting summary judgment because a plaintiff could not "establish that a fellow employee who did not share her race, ethnicity, color, sex, and/or gender—but who was otherwise similarly situated in all materials respects—was promoted while plaintiff was not").

Regardless, even assuming Wright could make a *prima facie* case for discrimination, Defendants have carried their burden of showing a non-discriminatory reason for not promoting Wright. Her performance reviews consistently criticized her interpersonal skills, noting that she did not spend enough time with her team members and showed a "general lack of awareness and attention to her colleagues." SOF ¶¶ 255–56. Wright argues this feedback played on racial stereotypes or derived from Grosshans' discriminatory attitudes concerning African Americans. But Wright includes no allegations or citations to the record that can show these criticisms were wholly unfounded or the reasoning was pretextual. The feedback is race neutral. There is no plausible allegation Grosshans made discriminatory comments about African Americans or women. And Wright has not adduced any evidence that a similarly situated white employee who spent the same or less time on mentorship, or had the same perceived difficulties with teamwork, did not receive the same feedback or was promoted despite similar issues.

### C. Failure to Pay

Last, Plaintiffs allege pay discrimination, claiming Defendants paid Chang, Ntoso, and Peng less than similarly situated white Executive Directors and Wright less than similarly

22

situated white Vice Presidents.   A pay discrimination claim requires a plaintiff to show "that: (1) she was a member of the protected class; (2) she was qualified for the job in question; (3) she was paid less than those who were not members of her protected class for the same work; and (4) the employer's adverse employment decision occurred under circumstances that raise an inference of discrimination." *Boatright v. U.S. Bancorp*, No. 18-CV-07293 (LJL), 2020 WL 7388661, at *14 (S.D.N.Y. Dec. 16, 2020).   For Title VII claims of pay discrimination, a plaintiff need not identify specific comparators to make out the third element and can instead provide evidence "that the challenged wage rate is not based on seniority, merit, quantity or quality of production, or any fact other than" race or sex. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019); *see id.* at 111 (reversing a grant of summary judgment where—although the plaintiff could not identify a comparator—she established that men in different positions received above-market rate compensation while women received below-market rate compensation).   To show an inference of discrimination, a plaintiff may provide direct or indirect evidence.   *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).   Such evidence can include "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Espinoza v. N.Y.C. Dep't of Transp.*, 304 F. Supp. 3d 374, 389 (S.D.N.Y. 2018).

In their motion, Defendants highlighted that the Third Amended Complaint alleged Plaintiffs were paid less than comparable white employees, but no Plaintiff at their depositions could identify a comparable white employee who was paid more than them.  Mot. at 27. Defendants argue that no Plaintiff has a claim regarding Defendants' failure to pay bonuses for 2020 because Mizuho only paid bonuses for current employees and—when Mizuho paid 2020

23

bonuses, each Plaintiff's employment had already ended.  And Defendants highlight that no Plaintiff produced evidence corroborating discrimination with respect to their total compensation.  *Id.*

In response, Plaintiffs make two arguments.  First, they argue "[t]he bonus data from 2017 to 2019 reveals a clear and compelling pattern of adverse compensation actions directed at the Plaintiffs."  Opp. at 23.  Plaintiffs then compare their bonuses from 2017 to 2019 to bonuses received by a white Managing Director, white Associate, and white Analyst in PUG.  They argue that while Plaintiffs' bonuses decreased from 2017 to 2019, "white male employees in the same group consistently received higher or increasing bonuses over the same years."  *Id.*  Second, Plaintiffs compare their total compensation to one white Managing Director within PUG, highlighting that the white Managing Director earned significantly more than each Plaintiff.

Neither of Plaintiffs' arguments can establish a *prima facie* case of discrimination under a failure to pay theory.  Plaintiffs' arguments comparing their bonuses to a white Managing Director, Associate, and Analyst in their group are deficient in numerous regards.  First, throughout this litigation, Plaintiffs have advanced the theory that they were paid less than comparable white Executive Directors (in the case of Chang, Ntoso, and Peng) or comparable white Vice Presidents (in the case of Wright).  Plaintiffs may not now at the eleventh hour and after the close of discovery advance an entirely new theory to support their failure to pay claims.  Doing so would impermissibly prejudice Defendants' ability to defend themselves.  Because discovery has already closed, Defendants may not seek new discovery addressing any alleged discrepancies between Plaintiffs' pay and that of the Managing Director, Associate, and Analyst now pointed to by Plaintiffs as evidence to defeat summary judgment on their discriminatory pay arguments.

Nevertheless, Plaintiffs' argument fails on substantive grounds as well because it ignores that Mizuho used a "total compensation structure" where bonuses were calculated with consideration of an employee's base salary to ensure total compensation (salary plus bonus) reflected an employee's productivity and contributions. Although Plaintiffs' bonuses decreased from 2016 to 2019, their total compensation rose and fell in a more variable pattern, as did other employees in PUG. For example, Wright and Peng's total compensation both increased from 2016 to 2017, while a white Managing Director's decreased in the same period. *See* Dkt. No. 140-7. Ntoso and Chang's total compensation also increased from 2018 to 2019. And, in 2018, Ntoso was one of the highest earners in PUG, earning more than a Managing Director in the same group. *Id.* Nor have Plaintiffs argued that Mizuho's "total compensation" policy was adopted for discriminatory reasons or as an after-the-fact pretext for discrimination.

Next, Plaintiffs cannot establish a failure to pay claim by comparing their earnings to *one* managing director in PUG. By that logic, any plaintiff could state a claim for discrimination any time he or she earned less than someone in the same department with a higher title. Furthermore, this argument ignores that Plaintiffs earned more than white employees in PUG (except for the white Managing Director) in virtually every year from 2016 to 2019.[9]

Accordingly, Plaintiffs have not carried their initial burden of showing a *prima facie* case of discrimination under a disparate pay theory.

Because Defendants have demonstrated that there is insufficient evidence to show discrimination in violation of Section 1981 or Title VII under a failure to pay, failure to promote, or discriminatory termination theory, and Plaintiffs have failed to point to evidence that could

---

[9] The one exception being in 2019 when a white Associate's total compensation exceeded both Peng and Wright's total compensation. *See* Dkt. No. 140-7.

25

support a jury verdict in their favor on these counts, summary judgment is granted for

Defendants on the counts of the Third Amended Complaint alleging racial discrimination in

violation of Section 1981 and Title VII (Counts One, Three, Four, Six, Eight, Ten, Eleven,

Twelve, Fourteen, and Fifteen).

**III.    SUMMARY JUDGMENT IS GRANTED FOR DEFENDANTS ON CHANG, PENG, AND WRIGHT'S RETALIATION CLAIMS UNDER SECTION 1981 AND TITLE VII**

Chang, Peng, and Wright allege retaliation in violation of Section 1981 and Title VII.

Retaliation requires a plaintiff to establish that "(1) she engaged in protected activity; (2) the

employer was aware of that activity; (3) the employee suffered a materially adverse action; and

(4) there was a causal connection between the protected activity and that adverse action." *Kelly*

*v. Howard I. Shapiro Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).

**A. Chang**

Chang alleges he "complained to Defendants about race discrimination" concerning his

"demotion," through counsel.  TAC ¶ 196.  Defendants retaliated, he alleges, by "terminating

him and deeming him ineligible for severance under the severance plan, denying him a JFY 2020

bonus, not paying him for his accrued vacation pay, and not providing him with healthcare." *Id.*

¶ 197.  As evidence that Chang engaged in protected activity, Plaintiffs cite a letter Chang's

former attorney sent Mizuho's in-house counsel on January 30, 2021 (the "Letter").  It states,

"this letter and our conversations constitute an unequivocal declaration of Mr. Chang's right to

be free of employment discrimination under federal, state, and city law.  As such, he is also

protected against retaliation." *See* Dkt. No. 150-30.[10]

---

[10] The record is devoid of evidence about the content of the "conversations" referenced in the Letter; only the Letter itself is in evidence.

Fatal to Chang's retaliation claim, the letter does not clarify that Chang was alleging discrimination on account of his race. *See Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally."); *see also Boata v. Pfizer, Inc.*, 2013 WL 432585, at *6 (S.D.N.Y. Jan. 31, 2013), *aff'd*, 54 F. App'x 73 (2d Cir. 2014) (holding "the law is law is well-established that, without more, the mere use of the word 'discrimination' does not transform a single email into protected activity"). Therefore, Chang cannot show a *prima facie* case of retaliation under Section 1981 or Title VII.

Chang's retaliation claim fails for the further reason that he cannot show a causal connection between the Letter and any adverse action. His counsel filed the Letter only *after* Chang had been told unequivocally that he was being transferred to CCS and there was "no . . . option" to remain in PUG.[11] The Letter stated Chang would not transfer to CCS. Because Chang would not accept the transfer and could not remain in PUG, his termination necessarily followed.

Finally, Chang similarly cannot show a causal connection between the Letter and his not receiving severance, accrued vacation, health insurance, or a bonus for the 2020 financial year. Based on Mizuho policies that applied generally and pre-dated Chang's transfer or termination, only employees currently employed on the date bonuses were distributed were entitled to receive bonuses, and Chang's employment had ended at least two months before Defendants made

---

[11] Chang's discussions with Grosshans indicated some possibility that Chang could apply for other internal openings at Mizuho, but Chang stated in his deposition that he made no efforts to do so. Dkt. No. 140-6 at 161:25–162:16. Chang's notes also reflect that Grosshans told him that, even if Chang did not want the transfer, he should accept it so that he could remain employed while looking for a new job. *Id.* at 171:14–18. This further corroborates that Chang understood he could not remain employed at Mizuho and remain within PUG.

payments for the 2020 bonuses.[12]  Furthermore, Chang had no entitlement to a severance package or accrued vacation or continued health insurance, and cannot point to any evidence substantiating that Defendants would have provided any of these benefits absent the Letter from his attorney.  *See Barriera v. Bankers Trust*, 2003 WL 22387099, at *8 (S.D.N.Y. Oct. 20, 2023) ("[The plaintiff] does not identify any . . . policies or practices that would entitle her to severance pay absent a signed severance agreement.  Because [the plaintiff] fails to show she had any right to collect severance pay, she cannot claim that [the defendant] took adverse employment action against her when it paid her only the money she had earned.").  Consistent with Mizuho policy generally, Chang had the option of receiving a separation package conditioned on signing a separation agreement, but he refused to do so.

## B.  Peng

Peng alleges retaliation after her counsel complained in fall of 2020 about racial discrimination, prompting Defendants to exclude her from internal meetings, withdraw her severance offer, and terminate her employment.  TAC ¶¶ 213, 255.

At the outset, the Court notes that Peng's retaliation claim rests entirely on an unsubstantiated allegation in the Third Amended Complaint that her lawyer complained in the fall of 2020 about racial discrimination.  No evidence in the record substantiates that any such communication occurred.  And Plaintiffs have given no corroborating details about the communication.  For example, the Court has no details on its timing except that it supposedly occurred in the fall of 2020.  Plaintiffs' opposition also incorrectly cites Dkt. Nos. 140-30 and -31 as the referenced complaint from Peng's counsel.  Opp. at 45.  Tellingly, however, those

---

[12] Mizuho operated a Japanese fiscal year running from April 1 of a given year to March 31 of the following year.  SOF ¶ 19.  Mizuho paid discretionary bonuses for a financial year in or around April of the following financial year.  *Id.* ¶ 94.

docket entries consist of communications between Mr. Liddle and Mizuho concerning Chang, only. Because nothing substantiates that Peng's lawyer complained about racial discrimination concerning Peng (besides conclusory allegations in the Third Amended Complaint), Peng's retaliation claim fails.

Even were the Court to credit that Peng's counsel complained in the fall of 2020 about racial discrimination directed at Peng, her retaliation claim fails given she cannot show a causal connection between the complaint and an adverse action.

Peng alleges she was excluded from internal meetings following her lawyer's complaint. But the Third Amended Complaint alleges Whitcher excluded her from M&A meetings due to his personal racial biases, and these exclusions seemingly predate her lawyer's alleged complaint in fall of 2020. Peng also testified that the Third Amended Complaint's reference to meetings she was excluded from were the M&A meetings Whitcher held. Dkt. No. 140-12 (Peng. Dep.) at 204:21–205:02 (confirming the meetings she was excluded from are the M&A meetings). But even assuming there was some evidence that these meetings occurred after a communication from Peng's counsel, there is no allegation Whitcher knew about any communication from Peng's counsel.

Peng cannot show a causal connection between her termination, the withdrawal of a severance offer, and her lawyer's alleged complaint, either. Peng was instructed to either transfer to New York or accept a separation package (or be terminated) in July 2020, before her lawyer made the alleged complaint in fall of 2020. Mizuho extended Peng's deadline to make an election multiple times, and HR contacted her lawyer on September 9, 2020, affirming that HR needed to know as soon as possible whether Peng would transfer to New York. SOF ¶ 292. Only months later, after Peng still failed to make an election, did HR email Peng on November

29

20, 2020, notifying her that her employment would end on December 31, 2020, without a separation package.  SOF ¶ 300.  Peng also cannot show the separation package was rescinded for a retaliatory reason given Mizuho's consistent position as to all Chicago-based PUG employees from July 2020 forward:  that the package was available only if Peng signed a separation agreement, which she did not do.

### C.  Wright

Wright alleges she complained of discrimination in 2018 and 2020 to HR and that Mizuho "retaliated by reducing her bonus compensation, terminating her employment, and denying her a severance package."  TAC ¶¶ 224, 271.  The Court is sensitive to Wright's allegations.  But, even drawing all inferences in Wright's favor, the Court cannot find the complaints were causally related to any adverse actions.

Regarding Wright's bonus compensation, there is no allegation HR informed Grosshans about the complaint.  And, as discussed above, the record regarding Wright's critical performance reviews and their connection to Wrights' bonuses is well-established; in contrast, there is no evidence that Wright's complaints about those reviews influenced the decisions on her bonuses.  Next, Wright's termination derived solely from her refusal to transfer to the New York office—a requirement imposed on all Chicago-based bankers with the exception of the head of the group, who was granted a modest accommodation.  And last, she was not eligible for a severance package given she refused to sign a release agreement (again, a requirement imposed uniformly by Mizuho on all employees).  Accordingly, Wright's retaliation claims under Section 1981 and Title VII must fail.

Accordingly, summary judgment is granted to Defendants on Counts Two, Five, Seven, Nine, Thirteen, and Sixteen.

IV.    SUMMARY JUDGMENT IS GRANTED FOR DEFENDANTS
        ON CHANG AND NTOSO'S NYCHRL CLAIMS

In addition to their Section 1981 and Title VII claims, Ntoso and Chang each brought claims under the NYCHRL.  Ntoso alleges discrimination based on race in violation of the NYCHRL, and Chang alleges discrimination based on race and age, as well as retaliation, in violation of the NYCHRL.  The Court assesses these claims independently from the Section 1981 and Title VII claims. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013).  Summary judgment on a NYCHRL claim is proper only "if the record establishes as a matter of law that 'discrimination played *no* role'" in an adverse employment decision. *Id.* (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38 n.27 (1st Dep't 2009)).

### A.  Ntoso's NYCHRL Claim Fails

Ntoso alleges the same theories of discrimination in his NYCHRL claim as in his Section 1981 and Title VII claims:  constructive termination, failure to promote, and failure to pay.  Summary judgment is appropriate on Ntoso' NYCHRL claim as Ntoso cannot succeed on any of the above theories.

The record reflects Mizuho's management actively supported Ntoso's aspirations towards becoming a managing director.  Grosshans indicated in Ntoso's 2019 performance review he wanted Ntoso to take a more leading role on several accounts.  SOF ¶ 209.  Donohue was similarly supportive of Ntoso taking a more active role in managing accounts. *Id.* ¶ 215.  On this record, Ntoso cannot point to any effort by someone at Mizuho aimed at halting his progress that would make him feel that he had no future at Mizuho.  Ntoso also raises no allegations or arguments supporting that he faced an intolerable work environment so as to support a constructive discharge claim.  Finally, Ntoso opted to resign once he secured a higher-paying

31

offer at a competitor of Mizuho and only after management refused his requests to raise his compensation to remain.

Ntoso's cannot succeed on a failure to promote theory for similar reasons. The record features ample examples of management supporting his career aspirations. And Ntoso cannot show he applied for and was denied a managing director position.

Last, regarding his failure to pay theory, Ntoso was one of the highest earners in PUG. Indeed, his compensation in at least one year exceeded that of a Managing Director in the same group. *See* Dkt. No. 140-7. Ntoso has also introduced no evidence showing African Americans were systematically paid more or less than non-African Americans at Mizuho.

Finally, and militating in favor of granting summary judgment to Defendants on all Ntoso's claims, Ntoso points to no evidence showing discrimination played any role in an adverse action harming Ntoso. He did not testify he heard negative comments about African Americans from his co-workers or felt excluded in any manner. He also never complained to HR, nor anyone for that matter, about facing discrimination while at Mizuho. At best, Ntoso testified he was frustrated with the pace of his advancement, his compensation, and his sense that his advancement was not guaranteed. But other than a wholly unsupported allegation in the Third Amended Complaint that Grosshans was not comfortable with African American bankers in client-facing roles, none of Ntoso's frustrations could be attributed by a rational jury to racial discrimination on this record.

Accordingly, the Court GRANTS summary judgment for Defendants on Ntoso's NYCHRL claim alleging racial discrimination (Count Nineteen).

**B. Chang Cannot Show Racial Discrimination in Violation of the NYCHRL**

Like Ntoso, Chang cannot show discrimination played any role in his termination, failure to receive a promotion, or his compensation. Regarding his termination, Grosshans made efforts

to recruit Chang into PUG in 2018 and advocated for Chang before senior management in 2020. SOF ¶ 397.  Nevertheless, Grosshans' performance reviews and Chang's self-assessments consistently noted that Chang continued to play a support role in PUG and performed similar duties as before his transfer into PUG from a credit group.  These documents are consistent with senior management's later determination that Chang was under-performing in PUG by not originating enough business and that his talents and skills would be better utilized in CCS, particularly given the staffing shortages in that group.  Chang refused to transfer although his own notes reflected that he understood that remaining in PUG was not "an option."  Therefore, Mizuho terminated his employment.  Nothing about this chronology is susceptible to the view that discrimination played any role in his termination.

In the Third Amended Complaint, Chang alleges Ventura and Donohue had made several racially insensitive comments, some several years before the events related to the offered transfer, and the most recent in 2019 (over a year before the transfer decision).  But neither individual had any role in Chang's transfer or eventual termination.  Accordingly, the entirety of Chang's discrimination argument depends on the allegation that, in a private conversation with Grosshans after the initial conversation about the transfer, Grosshans stated that Katz wanted people who "look like Whitcher."  At his deposition, Grosshans denied making this statement. Assuming for purposes of this motion that a jury credited Chang that the statement was made, in context this is a facially neutral comment.  Chang concedes that the context of the statement was him asking Grosshans, in substance, why he couldn't stay in PUG.  The depositions of Katz, Calistri, and Grosshans (and the related documentary evidence) are all consistent on the business decision to focus personnel in PUG on business generation and originating investment banking deals, the under-performance of Chang on those specific skills (which Whitcher had, in

management's view), and the view of Katz and Calistri (though not Grosshans) that Chang's skills and talents were thus of more value to Mizuho in a credit-focused group than in PUG. *See* SOF ¶¶ 393-98. In contrast, there is no record corroboration at all of Plaintiffs' argument that the statement is a reference to the fact that Whitcher is white and Chang is Asian-American, nor any other indication that any of the decisionmakers considered Chang's race or ethnicity in any way in the decision to require that he transfer groups if he wanted to stay at Mizuho.

Chang cannot succeed on a failure to promote theory, either. His performance reviews from Grosshans—who the record shows consistently supported Chang—highlighted that Chang functioned in a supporting role. Chang also never applied for a promotion, and cannot show that a particular promotion was available to him but instead offered to someone clearly less qualified because of race. To the contrary, PUG hired another Asian-American as a Managing Director during Chang's employment in the group, *id.* ¶¶ 164–65, a fact which Plaintiffs now attempt to deflect. Although several Plaintiffs testified in their depositions that the Managing Director in question was Korean-American, *id.*, Plaintiffs now allege in their brief that the Asian Managing Director is "white passing" and the jury should decide whether the Managing Director is "perceived as Asian." Opp at 6 n.2. The Court will not manufacture a jury question (with no record evidence) about whether the jurors agree with Plaintiffs' counsel that a particular person (unquestionably of Asian ethnicity) might "pass" as "white" to members of management that are white.

Last, no evidence supports that discrimination played a role in determining Chang's compensation. Chang has not identified any similarly situated white Executive Directors who earned substantially more than him. And he has not established that there was any meaningful difference between the compensation that Asians versus non-Asians earned at Mizuho.

34

Turning to Chang's age discrimination claim, the record is devoid of even a shred of evidence supporting that anyone discriminated against Chang based on his age.

Summary judgment is granted to Defendants on Chang's NYCHRL discrimination claim (Count Seventeen).

### C. Chang Cannot Show Retaliation under the NYCHRL

Chang also argues Mizuho retaliated against him in violation of the NYCHRL for complaining about discrimination. The elements of retaliation under the NYCHRL are the same as under Title VII except—instead of showing an adverse action, a plaintiff merely must show "that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Pouncy v. Advanced Focus LLC*, 2017 WL 4280949, at *6 (S.D.N.Y. Sept. 25, 2017), *aff'd*, 763 F. App'x 134 (2d Cir. 2019). The Court already determined summary judgment was appropriate on Chang's retaliation claims under Section 1981 and Title VII given Chang could not show a causal connection between the Letter and any adverse action. Accordingly, summary judgment is appropriate on his NYCHRL retaliation claim (Count Eighteen) for the same reason, applying the standards applicable under the NYCHRL.

## V.    SUMMARY JUDGMENT IS GRANTED FOR DEFENDANTS ON PLAINTIFFS' COMMON LAW CLAIMS

The Third Amended Complaint included three common law claims: termination without justifiable cause (Count Twenty); failure to pay bonuses in accordance with the applicable bonus plan in 2018, 2019, and 2020 (Count Twenty-One); and failure to make separation pay (Count Twenty-Two). Defendants are entitled to summary judgment on all three counts.

## A. Plaintiffs Cannot Succeed on an Unjust Termination Claim Because They Were at Will Employees

Plaintiffs' offer letters specified they were "at-will" employees who could be terminated without cause. Dkt. No. 140-1 at 1. This is fatal to Plaintiffs' claim that Mizuho terminated them without justifiable cause. Opposing this conclusion, Plaintiffs highlight their offer letters included an arbitration clause and argue that—by virtue of including an arbitration clause—their agreements feature an implicit just-cause standard. Opp. at 47. Plaintiffs also argue a New York state court recognized this principle in a decision called *Passaretta v. UBS Securities LLC*. *Id.* (citing *Passaretta v. UBS Sec. LLC*, No. 653340/2016, 2017 WL 4810687, at *4 (N.Y. Sup. Ct. Oct. 20, 2017).

Clear precedent from New York state courts requires this Court to reject Plaintiffs' argument. *See Smalley v. Dreyfus Corp.*, 10 N.Y.3d 55, 58 (2008) (recognizing New York is clear that an employer's right to terminate an employment at will remains unimpaired absent "a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment"). The Court may not read into a contract an implied term that "would be inconsistent with other terms of the contractual relationship." *Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 73 (1st Dep't 2000).

The case Plaintiffs cite, *Passaretta*, is also readily distinguishable because the state court was determining whether to uphold an arbitration award after the arbitrator concluded an employee was entitled to deferred compensation under an employment contract. Crucially, the New York State court found "the law mandates that [it] give broad leeway to the arbitrators' determinations and the meanings and remedies provided for under a particular contract." *Passaretta*, 2017 WL 4810687, at *4. This Court owes no such deference except to binding state

court decisions prohibiting it from grafting a term into Plaintiffs' agreements that contradicts those agreements' at-will termination clauses.

Accordingly, summary judgment is granted to Defendants on Count Twenty.

### B.  Breach of an Implied Contract to Pay Bonuses

Next, Plaintiffs argue their contracts included an implied contract to pay bonus compensation.  *See* Opp. at 48.  As evidence of this implied contract, Plaintiffs cite promises that Mizuho would pay them "competitive" compensation.  The Court need look no further than the terms of Plaintiffs' offer letters to reject this argument.  Each offer letter was clear that bonuses were discretionary, "*the award and* amount of which will be at the sole and absolute discretion of management." Dkt. No. 140-1 (emphasis added).  Furthermore, Mizuho's compensation documents stated bonuses were "discretionary." Dkt. No. 140-11 at 2–3.  Finally, Mizuho's generally-applicable policies stated that bonuses would be paid only to those who were current employees on the date that bonuses were distributed for a given year.  It is undisputed that none of the Plaintiffs were employed at Mizuho on the date that bonuses were distributed for FY 2020.

### C.  Plaintiffs Did Not Have a Right to Separation Payments

In Count Twenty-Two, Plaintiffs argue they were entitled to separation or severance pay. The plain text of their employment agreements precludes this argument.  The agreements specified that no Plaintiff was eligible for severance payments unless Defendants terminated them without cause and Plaintiffs signed a release. Dkt. No. 140-1 at 5.  Ntoso resigned.  Chang, Peng, and Wright, meanwhile, each refused to sign a release.  Accordingly, no Plaintiff was entitled to separation or severance pay.

## VI.    SUMMARY JUDGMENT IS GRANTED ON WRIGHT'S ERISA CLAIM

Finally, Count Twenty-Three of the Third Amended Complaint alleges "non-payment of severance pay under ERISA (Wright)" and simply states, "Plaintiffs were offered severance pay

but such amounts were conditioned on giving up all of their other claims as set forth herein including their statutory claims." TAC ¶ 299.  The Court cannot determine on what basis Wright seeks to bring a claim under ERISA, and the record provides no assistance.  Accordingly, summary judgment is granted for Defendants on Count Twenty-Three, as well.

## CONCLUSION

For the foregoing reasons, Mizuho's motion for summary judgment (Dkt. No. 117) is GRANTED.  The Clerk of Court is respectfully directed to terminate Dkt. Nos. 116, 117, and 157,[13] enter judgment in favor of Defendants, and CLOSE this case.

Dated: March 31, 2026
       New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge

---

[13] The Court GRANTS the motions to seal at Dkt. Nos. 116 and 157 given the sensitive nature of the documents and the limited redactions made by the parties to protect confidential client information or sensitive information from personnel files.